Raymond David **WHITTON,** Appellant,

v.

**STATE of Alaska,** Appellee.

No. 1153.

Supreme Court of Alaska.

Dec. 23, 1970.

Thomas E. Fenton, Jackson & Fenton, Fairbanks, for appellant.

G. Kent Edwards, Atty. Gen., Gerald J. Van Hoomissen, Dist. Atty., Thomas F. Keever, Asst. Dist. Atty., Fairbanks, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

DIMOND, Justice.

A jury found appellant guilty of the crime of robbery and of the crime of using

a firearm during commission of the same robbery. Appellant raises several points on this appeal in support of his contention that a new trial should be ordered.

*Double Jeopardy.*

In Count I of the indictment appellant was charged with robbery. This was in accordance with a statute making one guilty of the crime of robbery if he steals or takes anything of value from a person by force or violence or by putting such person in fear.[1] In Count II of the indictment, appellant was charged with the crime of using or carrying a firearm during the commission of a robbery. This was in accordance with another statute which makes it a felony to use or carry a firearm during the commission of robbery or other designated offenses.[2] Appellant argues that the two separate statutory offenses are essentially one crime, and that when he was sentenced for both he was placed in jeopardy twice for the same offense in violation of his constitutional rights.[3]

It is within the traditional scope of legislative power to deter anti-social behavior by enacting laws proscribing, under the pain of punishment certain courses of human conduct considered to be detrimental to an ordered society. In the course of regulating authoritatively the essential relations between the members of society, the legislature has allocated certain property rights to individuals, groups or collective units. It is in recognition and for the protection of those rights that laws have been enacted which provide for the infliction of punishment upon one who takes the property of another.

In criminal laws of this nature, society is asserting its basic interest in the protection of the person and his property. This interest may vary according to the circumstances in which the person is unlawfully deprived of his property. Such varying degrees of interest are expressed in criminal statutes which prescribe different punishments for what may be considered as one basic offense against a person's property rights, but which, because of the circumstances in which the property is taken from the person, are considered by society to be more or less grave.

This is exemplified by the statutes pertinent to this case. The legislature has made it a crime to steal or take from another anything of value. When this crime is committed without force or violence, and without putting the victim in fear, it is called larceny from the person, punishable by imprisonment for not less than one year nor more than five years.[4] When the crime is committed by force or violence, or by putting the victim in fear, it is called robbery, and the punishment is increased to a maxi-

---

1. AS 11.15.240 provides:
   *Robbery.* A person who, by force or violence, or by putting in fear, steals and takes anything of value from the person of another is guilty of robbery, and is punishable by imprisonment in the penitentiary for not more than 15 years nor less than one year.

2. AS 11.15.295 provides:
   *Use of firearms during the commission of certain crimes.* A person who uses or carries a firearm during the commission of a robbery, assault, murder, rape, burglary, or kidnapping is guilty of a felony and upon conviction for a first offense is punishable by imprisonment for not less than 10 years. Upon conviction for a second or subsequent offense in violation of this section, the offender shall be imprisoned for not less than 25 years.

3. The fifth amendment to the federal constitution provides:
   [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb.
   Article I, section 9 of the Alaska constitution provides:
   No person shall be put in jeopardy twice for the same offense. * * *
   *See* DeSacia v. State, 469 P.2d 369 (Alaska 1970).

4. AS 11.15.250 provides:
   *Larceny from the person.* A person who, other than by force and violence or by putting in fear, steals and takes from the person of another anything of value, is punishable by imprisonment in the penitentiary for not more than five years nor less than one year.

mum of 15 years imprisonment.[5] And when the robbery is committed while using or carrying a firearm, the punishment is even more severe—imprisonment for not less than 10 years for the first offense, and for not less than 25 years for a second or subsequent offense.[6]

The varying degrees of punishment, depending upon the manner or circumstances in which the act of stealing takes place, reflect society's legitimate interest in the protection of the person. We recognized this in Miller v. State[7] where we referred to the necessity of controlling man's destructive and aggressive impulses and of the need of developing rules to inhibit violence. In Gray v. State[8] we commented upon the obvious fact that when one commits a robbery with a firearm, he has created a situation fraught with peril, with an immediate threat of violence, and because of this is precluded from claiming self-defense to any act of violence that results from such a crime. As the threat of fear and force and violence increases, so must the deterrent to behavior creating this danger to the person, in order that life in society may be tolerable.

We cannot question the wisdom of the legislature in imposing a more stringent penalty for robbery where a firearm is involved. The inherent nature and purpose of a firearm is such as to create a danger of loss of life or serious injury to the person so as to merit the inhibiting force of a law imposing a minimum prison term of 10 years for one who commits a robbery in this manner. The question that we must decide is whether, where there is a single criminal event, one may be punished for two crimes—robbery, and robbery while using or carrying a firearm.

We acknowledge it is not entirely clear that two distinct offenses were intended by the legislature. The House Judiciary Committee report on the bill which was enacted as AS 11.15.295 in 1968[9] stated:

> This bill imposes mandatory sentences on the first and subsequent convictions for the commission of certain serious crimes if the individual is carrying a firearm. There is a 10-year minimum sentence for the first offense and 25 years for a subsequent offense.[10]

This might be construed as showing that the legislature intended only to modify the penalty provisions of robbery and other crimes to provide for mandatory, minimum sentences where such crimes were committed by a person using or carrying a firearm.

On the other hand, the committee report used the word "offense" in relation to the bill, and the statute states that one who commits designated offenses while using or carrying a firearm "is guilty of a felony." This is an indication that the legislature did not merely intend to provide for more severe penalties, but contemplated that when one committed, e. g., a robbery while using or carrying a firearm, he would have committed an offense different from the crime of robbery not involving a firearm.

At best the legislative intent in this regard is obscure. Since it is conceivable that separate, distinct offenses may have been intended, we feel we must pass upon the question of whether separate punishments may be imposed for the commission of separate statutory offenses arising from a single criminal event.[11]

5. AS 11.15.240, *supra* n. 1.

6. AS 11.15.295, *supra* n. 2.

7. 462 P.2d 421, 426 (Alaska 1969).

8. 463 P.2d 897, 908–910 (Alaska 1970).

9. H.B.No.333. SLA 1968, ch. 144, § 1.

10. 1968 Alaska H.J. 434.

11. There might be a different question involved if the legislature had intended to make a separate and distinct offense of the sole act of carrying a firearm during the commission of certain crimes, thus leaving those crimes to be separately punished under the statutes creating them. We believe, however, that the severity of the punishment provided for by the leg-

It is a fundamental concept, expressed in criminal statutes providing a single sentence of imprisonment for each distinct crime, that a defendant may not be punished more than once for the same offense.[12] But frequently the legislature will isolate and make criminal a number of steps arising out of one transaction, so that a defendant may be convicted and punished for multiple offenses arising out of a single activity. This type of legislation promotes the law-making body's legitimate objective of attacking a basic, unitary social evil by different legal devices, to the end that such evil will be entirely obliterated and all avenues of escape for offenders will be closed.[13]

The need to protect the individual from being punished more than once for the same offense, and the necessity of allowing the legislature freedom to effectively deal with a social evil in a variety of ways reflect the competing interests of the individual and society. How to fairly balance such interests has been a perplexing problem. One attempt to solve the problem has been through a rule of law which is applied for the purpose of determining whether a single criminal activity or transaction constitutes more than one offense. If there are, for example, two distinct statutory offenses arising out of one transaction, and one offense requires proof of an additional fact which the other does not, then according to that rule there are two separate offenses and not just one, and the defendant may be punished for both.

This rule was enunciated and applied by the Supreme Court of the United States in Blockburger v. United States in 1932.[14] There the defendant had been charged with violations of federal narcotics legislation.

He was convicted on one count of having sold a drug not in or from the original stamped package in violation of a statutory requirement, and on another count, of having made the same sale of the same drug not pursuant to a written order of the purchaser as required by the same statute. He contended that the two statutory crimes constituted but one offense for which only a single penalty could be imposed. The Supreme Court of the United States held that although both sections of the same statute had been violated by one sale, two offenses were committed because different evidence was needed to prove each of the violations, and therefore the defendant could be punished for both violations.

The rule in *Blockburger* is commonly referred to as the "same-evidence" test because, put another way, it means that different violations constitute one offense only when proof of all of them is established by the same evidence. Although this test has been widely used by the courts, it has been increasingly criticized as not coping satisfactorily with the problem it was designed to solve. Legislative refinement of an essentially unitary criminal episode into numerous separate violations of the law has resulted in a proliferation of offenses capable of commission by a person at one time and in one criminal transaction. Since each violation by definition will usually require proof of a fact which the others do not, application of the same-evidence test will mean that each offense is punishable separately. But as the separate violations multiply by legislative action, the likelihood increases that a defendant will actually be punished several times for what is really and basically one criminal act.[15]

islature, as well as the legislative history referred to, are sufficient to show that AS 11.15.295 is directed at the totality of the conduct—both the substantive crime and the act of using or carrying a firearm—and not merely at the narrow conduct involved in the use or carrying of a gun.

12. Gray v. State, 463 P.2d 897, 911 (Alaska 1970).

13. *See* Gore v. United States, 357 U.S. 386, 389–391, 78 S.Ct. 1280, 1282–1284, 2 L.Ed.2d 1405, 1408–1409 (1958).

14. 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932).

15. Case comment, 43 Notre Dame Law 1017, 1019–20 (Symposium 1968) ; Kirchheimer, The Act, the Offense and Double Jeopardy, 58 Yale L.J. 512, 527–29

Recognizing the limitations of the same-evidence rule, attempts have been made to meet the problem in other ways. Some courts have adopted the same-transaction test. This means that there may be only one punishment if a number of separate statutory violations arise out of a single criminal act or transaction.[16] We believe that there are as many difficulties inherent in this method as with the same-evidence rule. Where a court is faced with the problem of whether to impose multiple sentences, it tries to determine whether the separate statutory violations for which the defendant was convicted amounted to the same offense. Under the same-transaction test, the different violations would amount collectively to the same offense if they all arose in the course of the same criminal act or transaction. But a single course of criminal conduct may involve violations of different statutes, with differences in acts performed, in means of perpetration, and intent. The question then arises as to just what is a single criminal transaction. It may be just as difficult in some cases to determine whether the wrongful course of conduct involved constitutes a single criminal transaction as it is to determine whether such conduct, involving separate statutory violations, amounts to the same offense.

A person may break into a house with the intent to steal some money. He has committed the crime of burglary. As he enters he is confronted by the owner, and within seconds he shoots the owner with intent to kill him, leaves him for dead, takes the money he came after, and departs. Some of the crimes with which he could be charged are burglary, assault with a dan-gerous weapon, assault with intent to kill and robbery. In one sense there was a single criminal transaction, because the separate criminal acts, in the brief time in which they were committed, were unitary events since they merge one into the other. On the other hand, this general criminal act or transaction may not really be characterized as single or one, because four distinct and separate acts were committed, with distinguishing characteristics, which the legislature had the right to denominate as entirely different crimes. The same-transaction test, therefore, will not always provide a solution to the problem of when separate violations of the law constitute the same offense.

In more recent years the United States Supreme Court has adopted what is called a rule of lenity. This rule, briefly stated, is that where Congress has enacted a number of statutory criminal prohibitions which a defendant may have violated in a single transaction, and the question is whether the multiple sentences should be imposed, doubt as to what Congress intended will be resolved against turning a single transaction into multiple offenses. Thus, unless it is clear that Congress has intended there be multiple punishments, the legislative silence will be construed in favor of lenity, i. e., of imposing only one sentence for different statutory violations that amount to a single or unitary criminal event.[17] As stated in Ladner v. United States, where the defendant had been convicted and consecutively punished for wounding two federal officers with one shotgun blast:

This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty

(1949); Lugar, Criminal Law, Double Jeopardy and Res Judicata, 39 Iowa L. Rev. 317 (1954); Consecutive Sentences in Single Prosecutions: Judicial Multiplication of Statutory Penalties, 67 Yale L.J. 916 (1958).

16. Case comment, 43 Notre Dame Law 1017, 1020–21 (Symposium 1968); Double Jeopardy and the Multiple-Count Indictment, 57 Yale L.J. 132, 134 (1947).

17. Heflin v. United States, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); Ladner v. United States, 358 U.S. 169, 177–178, 79 S.Ct. 209, 213–214, 3 L.Ed. 2d 199, 205 (1958); Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957); Bell v. United States, 349 U.S. 81, 83–84, 75 S.Ct. 620, 622–623, 99 L.Ed. 905, 910–911 (1955). See case comment, 43 Notre Dame Law 1017, 1021–22 (Symposium 1968).

that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended. If Congress desires to create multiple offenses from a single act affecting more than one federal officer, Congress can make that meaning clear. We thus hold that the single discharge of a shotgun alleged by the petitioner in this case would constitute only a single violation * * *.[18]

The rule of lenity focuses on legislative intent, or the lack of it. But there are difficulties here also, as there may well be with any test that may be devised. It is seldom an easy thing to know what the legislature intended in this area of criminal law. As Judge Leventhal has stated in his concurring opinion in Irby v. United States,[19] "for the most part there is no ascertainable legislative intent on cumulation of punishment in relation to any particular offense or group of offenses * *." Furthermore, it is conceivable that the legislature may well have intended that multiple punishments be imposed for separate statutory offenses arising out of one criminal episode, and if legislative intent must govern in such a case it would follow that a person may well be punished more than once for the same offense.

This brings us to the point of our major concern—the constitutional prohibition against double jeopardy. The fifth amendment to the federal constitution provides that a person shall not "be subject for the same offense to be twice put in jeopardy of life and limb." This constitutional guarantee is applicable to the states through the fourteenth amendment.[20] Its purpose, as stated by the United States Supreme Court in Green v. United States was to prevent the government from making "repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, * * *"[21] As stated more recently in Ashe v. Swenson, the double jeopardy clause "stands as a constitutional barrier against possible tyranny by an overzealous prosecutor."[22]

The question before us is whether the double jeopardy provision protects against multiple punishments for the same offense. The United States Supreme Court in 1941 in Holiday v. Johnston[23] held that it did not. This view had support in decisions of other courts.[24] On the other hand, there have been decisions going the other way in holding that the constitutional prohibition against double jeopardy does protect an accused against double punishment for the same offense.[25]

In 1969 in the case of North Carolina v. Pearce the United States Supreme Court stated flatly, without reference to its 1941 decision in Holiday v. Johnston,[26] that the fifth amendment guarantee against double jeopardy protected among other things, "against multiple punishments for the same offense."[27] But this decision in *Pearce*

18. 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199, 205 (1958).

19. 129 U.S.App.D.C. 17, 390 F.2d 432, 436 (1967).

20. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

21. Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204 (1957).

22. 397 U.S. 436, 456, 90 S.Ct. 1189, 1200, 25 L.Ed.2d 469, 482 (1970) [concurring opinion of Justices Brennan, Douglas and Marshall].

23. 313 U.S. 342, 349, 61 S.Ct. 1015, 1017, 85 L.Ed. 1392, 1396 (1941).

24. Calvaresi v. United States, 216 F.2d 891, 902 (10th Cir. 1954); White v. Pescor, 155 F.2d 902, 904 (8th Cir. 1946). *See* Consecutive Sentences in Single Prosecutions: Judicial Multiplication of Statutory Penalties, 67 Yale L.J. 916, 918–19 (1958); Statutory Implementation of Double Jeopardy Clauses: New Life for a Moribund Constitutional Guarantee, 65 Yale L.J. 339, 350 (1956).

25. Tritico v. United States, 4 F.2d 664, 665 (5th Cir. 1925); Murphy v. United States, 285 F. 801, 817 (7th Cir. 1923).

26. 313 U.S. 342, 349, 61 S.Ct. 1015, 1017, 85 L.Ed. 1392, 1396 (1941).

27. North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 665 (1969).

did not relate to the problem with which we are faced, i. e., whether double jeopardy applies when two or more statutory violations amount to the same offense. *Pearce* held only that the double jeopardy guarantee was violated when punishment already exacted for an offense was not fully credited in imposing sentence upon a new conviction for the same offense. And the cases cited in support of the proposition announced by the court in *Pearce* were similarly restrictive.[28]

The closest the Supreme Court has come to meeting the problem with which we are concerned was in the 1958 decision of Gore v. United States.[29] In that case the defendant had been convicted in one trial of six statutory offenses relating to the sale of narcotics, and received six separate sentences. He challenged the legality of the sentences on the ground that he had essentially committed only one offense and should have received only a single sentence.

The defendant's claim was rejected. In expressing the views of five members of the court, Justice Frankfurter reviewed and reaffirmed the *Blockburger* doctrine, or same-evidence test, and held that it was not violative of the double jeopardy clause of the constitution. Of the four justices dissenting in *Gore,* two were of the opinion that the same-evidence test was offensive to the prohibition against double jeopardy, and that *Blockburger* should be overruled.[30]

In Ashe v. Swenson decided this year,[31] seven members of the court, in four separate opinions, reached the conclusion that double jeopardy prevented a state from trying a man for robbery of one of six players in a poker game after he had been acquitted for robbery of another of the players in the same game. The court stated, however, that the question decided related to successive prosecutions, and not to whether the defendant could be charged with six separate offenses for the robbery of the six players, or whether he could have received a total of six punishments if he had been convicted in a single trial of robbery of the six victims.[32]

The *Gore* case appears to be the latest decision by the United States Supreme Court on the question of double jeopardy as it bears on multiple punishments for what might amount to a single or "the same" criminal offense. Assuming that *Gore* stands for the proposition that the constitutional prohibition against double jeopardy does not pertain to multiple punishments, we would be obliged to follow that interpretation under the supremacy clause of the federal constitution.[33] But this would be the case only as to the United States Constitution. Alaska has its own constitutional provision relating to double jeopardy, and as to that we are free to make our own interpretations as long as they do not detract from minimum national standards for the protection of human rights as established by the United States Supreme Court in decisions interpreting the federal constitution.[34]

■ Alaska's constitution provides that "no person shall be put in jeopardy twice

**28.** Ex parte Lange, 18 Wall. 163, 21 L.Ed. 872 (1874), held invalid a sentence of one year and a fine of $200 where the statute pursuant to which appellant was charged authorized as a maximum one year imprisonment or a fine of $200. United States v. Benz, 282 U.S. 304, 51 S.Ct. 113, 75 L.Ed. 354 (1931) held valid a court order reducing the sentence of the defendant from 10 months to six months, when done in the same term.

**29.** 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed. 2d 1405 (1958).

**30.** 357 U.S. 386, 395–397, 78 S.Ct. 1280, 1285–1287, 2 L.Ed.2d 1405, 1411–1413

[dissenting opinion of Justice Douglas, concurred in by Justice Black].

**31.** 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed. 2d 469 (1970).

**32.** *Id.,* 397 U.S. at 446, 90 S.Ct. at 1195, 25 L.Ed.2d at 477.

**33.** Mealey v. Martin, 468 P.2d 965, 967 (Alaska 1970).

**34.** Baker v. City of Fairbanks, 471 P.2d 386, 401 (Alaska 1970); Roberts v. State, 458 P.2d 340, 342–343 (Alaska 1969).

for the same offense."[35] The present dictionary meaning of "jeopardy", as it pertains to a person, is the loss or injury or hazard or peril or danger to which one may become exposed.[36] When a person is convicted of a crime, he has been exposed to the danger of loss of his freedom by way of imprisonment. The conviction of the offense places him in jeopardy. If this one conviction makes him liable for two sentences, instead of one, then the loss or peril to which he has been exposed—double punishment—has placed him in jeopardy twice for the same offense. We believe that multiple punishments for one or "the same" offense violate our constitutional inhibition against double jeopardy.

When we speak of the "present dictionary meaning" of double jeopardy we are not unaware of Justice Frankfurter's view in *Gore* that the meaning of that term cannot be decided from the dictionary, that since the principle of double jeopardy is derived from history, its historical origin must be examined to ascertain its significance and scope,[37] and that the principle of double jeopardy is not an evolving concept like that of due process.[38] We do not depreciate history as a valuable means of ascertaining the scope of a constitutional safeguard. It was because of its historical origin that the federal constitutional prohibition against double jeopardy has been construed, as recently as this year, to prevent the state of Missouri from successively prosecuting a man for robbing different persons in the same poker game.[39] Our

point is that history must not be used in a constrictive or limiting way in the area of human rights.

■ We respectfully disagree with Justice Frankfurter's view that double jeopardy is not an evolving concept as due process is.[40] What in fact today is "jeopardy" as it relates to a criminal offense, according to the existing common understanding of the term, may not have been even contemplated at the time the federal constitutional provision was adopted, or for that matter, the Alaska constitutional provision.[41] Our constitution, at least in its Declaration of Rights in Article I where the prohibition against double jeopardy is found, is not static. It is a viable, active thing, designed to serve the needs of humanity and society with the ability to accommodate to changes which inevitably occur with the progress of our civilization.[42]

We hold that Alaska's constitutional prohibition against double jeopardy prevents one from receiving multiple prison sentences for the same offense. We know it is not an easy thing to determine in every case when two or more statutory violations constitute the same offense. This problem has been the subject of a considerable amount of thoughtful discussion and debate among courts and legal commentators.[43] We have discussed briefly the "same-evidence" and "same-transaction" tests. Variations of these tests are the "material element" test, the "single intent" test and the "gravamen of the offense" test.[44]

35. Alaska Const., art. I, § 9.

36. Webster's International Dictionary 1332 (2d ed. 1959).

37. Green v. United States, 355 U.S. 184, 199, 78 S.Ct. 221, 230, 2 L.Ed.2d 199, 211 (1957) [dissenting opinion of Justice Frankfurter]; Gore v. United States, 357 U.S. 386, 392, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405, 1410 (1958) [majority opinion by Justice Frankfurter].

38. Gore v. United States, 357 U.S. 386, 392, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405, 1410 (1958).

39. Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

40. Baker v. City of Fairbanks, 471 P.2d 386, 403 (Alaska 1970).

41. The Alaska constitution was written in 1956.

42. Baker v. City of Fairbanks, 471 P.2d 386, 403 (Alaska 1970).

43. A bibliography of law review articles on this subject is attached as an appendix to this opinion.

44. Commonwealth v. Hermankevich, Section (B) of the Pennsylvania Deadly Weapons Act, and Multiple Punishment, 31 U.Pitt.L.Rev. 476, 486 (1970).

We have also spoken of the rule of lenity and the attempt to focus on legislative intent. It has been suggested that the problem be met by ascertaining legislative purpose from a consideration of the social norms or interests or values sought to be vindicated by criminal statutes, and the various objectives of the criminal law such as reformation, rehabilitation, retribution, isolation and deterrence.[45]

Another commentator has recommended solution of the problem by a legislative enactment which would provide that the court, when confronted with the question of multiple punishment, take into consideration (1) whether the illegal acts were a single continuing offense, (2) whether the number of victims affected the gravity of an offense, (3) whether one offense was included in another, (4) whether a specific statute should exclude a general one, and (5) whether in reaching the final result by successive acts under the same statute, an accused has caused greater social harm or demonstrated more serious criminal intent than if he had accomplished the same criminal result by a single act.[46]

Also related to legislative purpose are the rules devised by Kirchheimer.[47] It is his belief that there is a lack of legislative intent to impose multiple punishments (1) where two statutes are alternative, i. e., where conviction under one is inconsistent with conviction under the other for the same criminal conduct, (2) where one offense is included in another, as where violation of the second offense always involves violation of the first, (3) where one offense is preparatory, in that it is ordinarily committed in preparation for another, and (4) where several statutes are not usually violated together, where they seem to be designed to protect the same social interest and, therefore, where the inference is created that the function of the multiple statutes is only to allow alternative punishment.[48]

More recently proposed solutions relate to the intent of the criminal. In 1967 Judge Leventhal, in his concurring opinion in Irby v. United States,[49] expressed the belief that the rule focusing on changes in extent and direction of the defendant's criminal intention provided a basis for permitting cumulative punishment that is related to mens rea.[50] In that same case the majority opinion referred to an amicus curiae suggestion that in determining whether to impose multiple punishments, attention should be directed to whether the defendant was motivated by a single intent or objective, and to the necessity of achieving recognized sentencing goals.[51] In 1969 the Supreme Court of California stated that multiple punishments would not be permitted where there is a course of conduct composing an indivisible transaction. The divisibility of the course of conduct would depend upon the objective of the defendant, and if all the offenses were incident to one objective, the defendant could be punished for any one of them but not for more than one.[52]

We realize that the problem involved cannot be solved by the easy application of a pat mechanical formula. This is evident from the critical and discerning discussion of the subject by the courts and legal writers. But the problem has to be met so that society's very basic interest in deterring criminal behavior can be vindicated, and at the same time so that the individual's con-

45. Consecutive Sentences in Single Prosecutions: Judicial Multiplication of Statutory Penalties, 67 Yale L.J. 916 (1958).

46. Case comment, 43 Notre Dame Law 1017, 1024 (Symposium 1968).

47. Kirchheimer, The Act, the Offense and Double Jeopardy, 58 Yale L.J. 513 (1949).

48. Kirchheimer's suggested rules are discussed in the commentary, Twice in Jeopardy, 75 Yale L.J. 262, 318–20 (1965).

49. 129 U.S.App.D.C. 17, 390 F.2d 432 (1967).

50. Id. 390 F.2d at 439.

51. Id. at 435.

52. People v. Bauer, 1 Cal.3d 368, 82 Cal. Rptr. 357, 362, 461 P.2d 637, 642 (1969).

stitutional right not to be placed in jeopardy more than once for the same offense can be protected. As Judge Leventhal stated in *Irby*: "[W]hen there is need our law has traditions and mechanisms for coping with even difficult factual questions." [53]

■ The problem we are faced with has arisen by reason of legislative division or refinement of what may be a unitary criminal episode into a number of statutory offenses, with differences based upon intent or means or method of perpetration. In determining whether several statutory violations constitute the same offense for double jeopardy purposes, we will no longer follow the same-evidence test as enunciated in Blockburger, v. United States,[54] and which we had followed in our decisions in Chambers v. State,[55] Selman v. State,[56] and Martin v. City of Fairbanks.[57]

We now meet the problem in another way, with confidence that it can be solved, by focusing upon the quality of the differences, if any exist, between the separate statutory offenses, as such differences relate to the basic interests sought to be vindicated or protected by the statutes.

■ The trial judge first would compare the different statutes in question, as they apply to the facts of the case, to determine whether there were involved differences in intent or conduct. He would then judge any such differences he found in light of the basic interests of society to be vindicated or protected, and decide whether those differences were substantial or significant enough to warrant multiple punishments. The social interests to be considered would include the nature of personal, property or other rights sought to be protected, and the broad objectives of criminal law such as punishment of the criminal for his crime, rehabilitation of the criminal, and the prevention of future crimes.

■ If such differences in intent or conduct are significant or substantial in relation to the social interests involved, multiple sentences may be imposed, and the constitutional prohibition against double jeopardy will not be violated. But if there are no such differences, or if they are insignificant or insubstantial, then only one sentence may be imposed under double jeopardy. Ordinarily the one sentence to be imposed will be based upon or geared to the most grave of the offenses involved,[58] with degrees of gravity being indicated by the different punishments prescribed by the legislature.

■ In the event the trial judge decides, under the test we have established, that multiple sentences may be imposed without contravening the double jeopardy provision, the reasons for his determination must affirmatively appear in the record. There should be a statement by the judge of the relevant factual and other considerations which led him to such a decision, in order that the constitutional legitimacy of the multiple sentences may be fully reviewed on appeal.

The test we adopt to determine whether different statutory violations amount to the same offense is quite close to the view advocated by Justice Rutledge in 1942,[59] and which has been recommended as a proper view in a recent law review article written

53. Irby v. United States, 129 U.S.App. D.C. 17, 390 F.2d 432, 438 (1967).

54. 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932).

55. 394 P.2d 778, 780 (Alaska 1964).

56. 406 P.2d 181, 187 (Alaska 1965).

57. 456 P.2d 462, 466 (Alaska 1969). *Cf.* Dapcevich v. State, 360 P.2d 789, 790 (Alaska 1961).

58. Consecutive Sentences in Single Prosecutions: Judicial Multiplication of Statutory Penalties, 67 Yale L.J. 916, 930 (1958); *See* Judge Leventhal's concurring opinion in Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432, 436 (1967).

59. District of Columbia v. Buckley, 75 U.S.App.D.C. 301, 128 F.2d 17, 21–22 (1942) [concurring opinion of Justice Wiley Rutledge].

by Michael McElroy.[60] Our test undoubtedly will be subject to criticism, as Justice Rutledge's has been, for failure to provide a method or rule for determining when differences between statutory offenses are substantial or insubstantial.[61] It is true that the test of whether differences in acts are substantial is not as precise as one would wish. But the test is by no means obscure or lacking in meaning. The law constantly uses similarly indefinite concepts, such as "justice", "fairness", "reasonableness", and many others.

We have stated the factors to be considered by the sentencing judge. We can go no further. At this point, reason and judgment must be exercised. There is no practicable way of formulating in advance any precise standards for the proper or "reasonable" exercise of such reason and judgment.

If the rule we have adopted is lacking in definiteness, the danger of prejudice, either to society or to the individual, is not grave. If mistakes are made in the imposition of sentences, there are remedies both for the individual and society. Where the imposition of multiple sentences violates a defendant's constitutional protection against double jeopardy, he may appeal to this court and have his constitutional right vindicated. Where the sentencing judge makes a mistake in favor of the individual and against society's interest, in erroneously determining that two or more criminal violations constitute the same offense when they should properly be treated as separate offenses, the state may seek review by this court on the ground that the sentences are too lenient.[62] It is true that under our statutory authority to review sentences at the instance of the state, the legislature has provided that we are not authorized to increase a sentence if we find it too lenient.[63] But we are authorized to express our views as to the state's claim of exces-

---

60. McElroy, Double Jeopardy: The Ephemeral Guarantee, 5 Crim.L.Bull. 375, 399 (1969).

61. Kirchheimer, The Act, the Offense and Double Jeopardy, 58 Yale L.J. 513, 531–32 (1949).

62. In 1969 the Alaska legislature extended the jurisdiction of this court to encompass the review of sentences imposed by the superior court.

AS 22.05.010 provides:

*Jurisdiction.* (a) The supreme court has final appellate jurisdiction in all actions and proceedings. The supreme court may issue injunctions, writs of review, mandamus, certiorari, prohibition, habeas corpus, and all other writs necessary or proper to the complete exercise of its jurisdiction. Each justice may issue a writ of habeas corpus, upon petition by or on behalf of any person held in actual custody and may make the writ returnable before the justice himself or before the supreme court, or before any judge of the superior court of the state. An appeal to the supreme court is a matter of right, except that the state shall have no right of appeal in criminal cases, except to test the sufficiency of the indictment or information and under (b) of this section.

(b) The supreme court has jurisdiction to hear appeals of sentences of imprisonment lawfully imposed by the superior courts on the grounds that the sentence is excessive or too lenient and, in the exercise of this jurisdiction, may modify the sentence *as provided by law* and by the constitution of this state. For the purpose of considering appeals of sentences on these grounds, the supreme court may sit in divisions.

AS 12.55.120(a) provides:

A sentence of imprisonment lawfully imposed by the superior court for a term or for aggregate terms exceeding one year may be appealed to the supreme court by the defendant on the ground that the sentence is excessive. By appealing a sentence under this section, the defendant waives the right to plead that by a revision of the sentence resulting from the appeal he has been twice placed in jeopardy for the same offense.

63. AS 12.55.120(b) provides:

A sentence of imprisonment lawfully imposed by the superior court may be appealed to the supreme court by the state on the ground that the sentence is too lenient; however, when a sentence is appealed by the state and the defendant has not appealed the sentence,

sive leniency. If we determine that a sentencing judge has mistakenly applied the test we have prescribed for determining identity of offenses, and has imposed too lenient a sentence, we shall state the reasons for our determination in a written, published opinion. This will have the salutary effect of further clarifying this area of criminal law and of obviating the making of the same or similar mistakes in future sentencings.[64]

■ We apply the test we have adopted to this case. Money was taken from persons in a restaurant by appellant and his two accomplices who were armed with a rifle and a pistol. Since the presence of the firearms means that the money was taken by force or violence, or by putting the victims in fear, the crime committed was robbery. And since the force or violence or fear was created specifically by the use of the firearms, the more serious crime of robbery with a firearm was also committed.

The more serious crime differs from the less serious in that there can be the crime of robbery with or without a firearm. But the intent and conduct involved in the former encompasses the intent and conduct involved in the latter. Since the more serious offense already proscribes and punishes the activity of the less serious offense, the differences between the two offenses must be deemed insubstantial or insignificant in relation to the social interests involved.

The result is that the two separate statutory crimes constitute the "same offense" for purposes of double jeopardy. A single sentence was all that could properly be imposed under the double jeopardy provision of our constitution.

It could be urged that double jeopardy is not involved because the two sentences,

each of which was for 10 years, were to run concurrently. The practical effect of this, it could be argued, is that appellant has really received only one 10-year sentence instead of two. We could not agree with this contention. We pointed out in Gray v. State[65] that there are collateral disadvantages that follow from receiving two concurrent sentences, such as the prejudicial effect on the prisoner's chances of parole. Since the likelihood or lack of it of being released on parole is a critical factor in relation to imprisonment and the consequent deprivation of liberty, this collateral consequence of concurrent sentences does affect jeopardy in a very substantial way.[66] Where two sentences are imposed for the same offense, even though they are for the same period of time and are to run concurrently, the constitutional prohibition against double jeopardy has been violated.

*Statement of Codefendant.*

■ There was testimony that the three robbers wore knitted ski masks. A state's witness, Tony Daniel, testified that the night before the robbery he was playing pool with Sid Aldridge and that one of the convicted robbers, Daniel Born, had come into the pool room and asked Aldridge if he had any "boggins", or ski masks. Appellant's counsel objected to Daniel's testimony "with respect to" appellant, the district attorney stated that he was offering such testimony only with reference to Born, and the court stated "[v]ery well". Appellant made no further issue of this point, and did not move to strike Daniel's testimony. Later in the trial, when Born testified in his own defense, he denied having asked Aldridge about boggins or ski masks.

Appellant now claims that the statement of Born that Daniel testified to deprived appellant of his constitutional right to con-

---

the court is not authorized to increase the sentence but may express its approval or disapproval of the sentence and its reasons in a written opinion.

64. *See* State v. Chaney, 477 P.2d 441 (Alaska, December 7, 1970).

65. 463 P.2d 897, 911 (Alaska 1970).

66. *See* Chief Justice Nesbett's dissenting opinion in Faulkner v. State, 445 P.2d 815, 827–829 (Alaska 1968).

front a witness (Born) against him. Appellant relies on the United States Supreme Court decision in Bruton v. United States.[67] In that case a witness was allowed to testify as to an oral confession made by Bruton's codefendant which implicated Bruton. The codefendant did not take the stand, and therefore could not be cross-examined by Bruton. The trial court had instructed the jury that the witness' testimony was admissible only as to Bruton's codefendant, but as to Bruton himself was inadmissible hearsay and was to be disregarded.

The United States Supreme Court reversed Bruton's conviction. It held that the constitutional right of an accused in a criminal case to confront the witnesses against him includes the right of cross-examination, and this right had been denied as to Bruton when he could not cross-examine his codefendant as to his alleged confession, and that the limiting instruction to the jury by the trial judge did not eliminate the substantial prejudice to Bruton resulting from the fact that the alleged confession of his codefendant was "powerfully incriminating" as to Bruton.

*Bruton* has no application. There is no showing here, as there was in that case, that Born's alleged inquiry as to "boggins" in the pool hall was "powerfully incriminating" or "devastating" to appellant.[68] Appellant was in no way involved in that incident—his name was not even mentioned. It is true, as appellant contends, that other evidence showed a close relationship or friendship between Born and appellant, and that "boggins" or ski masks were worn by the robbers. But this is not enough to lead to the conclusion that Born's alleged inquiry as to ski masks lent any substantial weight to the case against appellant.[69] Appellant was not de-

nied his constitutional right of confrontation.

*Principal and Accessory.*

Count II of the indictment charged that the two defendants, Born and appellant, each used and carried a firearm during the commission of the robbery. The evidence showed that only one of them carried a firearm, and there was no direct proof as to who it was. Appellant argues that a verdict of acquittal ought to have been directed for him as to the offense of using or carrying a firearm during a robbery, since it was not proved beyond a reasonable doubt that it was he who was armed.

The jury was instructed that:

All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with criminal intent aid and abet in its commission are regarded by the law as principals in the crime thus committed and are equally guilty thereof.

The jury was also instructed that appellant could be found guilty of armed robbery if "one of the principals to the robbery carried or used a firearm during the commission of the robbery."

These instructions were proper statements of the law. Assuming that it was Born and not appellant who actually carried the gun, appellant would still be guilty as a principal.[70]

Appellant also contends that since the indictment charged each of the two defendants with carrying a firearm, and the proof showed that only one of them did, there was a fatal variance between the indictment and the proof, and that appellant's conviction of robbery while carrying

---

67. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

68. *Id.* 391 U.S. at 135–136, 88 S.Ct. at 1627–1628, 20 L.Ed.2d at 485.

69. *See* United States v. Lipowitz, 407 F. 2d 597, 601–603 (3d Cir. 1969), cert.

denied, Smith v. United States, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969); United States v. Hoffa, 402 F.2d 380, 386–387 (7th Cir. 1968).

70. Ransom v. State, 460 P.2d 170, 172–173 (Alaska 1969).

a firearm must be reversed. This point is disposed of by our decision in Ransom v. State.[71] Since the difference between principals and accessories has been abolished, appellant could be found guilty as a principal, even though it was his co-defendant and not he who carried the firearm. Therefore, appellant could be properly charged as a principal in those circumstances, and there would be no variance between the indictment and the proof.

### Cross-Examination of Daniel.

Tony Daniel, a witness for the state, implicated appellant and Born in the crime by identifying the weapons used in the robbery as having been left at Daniel's house by appellant and Born until the night before the robbery. On cross-examination, appellant's counsel ascertained from Daniel that he had appeared in a police lineup, had been A.W.O.L. from the Army at one time, and had been picked up on a curfew violation, but had never been charged with or investigated for any crimes. In response to a question, Daniel stated that he had been interviewed by F.B.I. agents during the month of January 1969.[72] But when counsel attempted to find out from Daniel what he had been interviewed about, the prosecutor objected and the objection was sustained.

A colloquy then ensued among counsel and the trial judge. What appellant's counsel wanted to show was that Daniel had been involved in a burglary and in passing forged checks, that he had been promised or expected immunity from prosecution for those offenses if he cooperated with the state in testifying against appellant and Born and, therefore, that he would be biased in favor of the state and his credibility as an impartial witness would be suspect.

After some discussion, the court ruled that counsel could ask Daniel if he had been promised immunity from prosecution as to offenses he may have committed, but that he could not ask whether Daniel "expected" any such immunity. The court would not permit counsel to inquire as to Daniel's involvement in other crimes that may have been committed. Appellant contends that it was reversible error to so limit his cross-examination of Daniel, because he was deprived of his right to discredit Daniel by showing his bias toward the state and against appellant.

In restricting the cross-examination of Daniel, the trial judge apparently was relying on the rule which permits the impeachment of a witness by showing he has been convicted of a crime, but which forbids impeachment by "evidence of particular wrongful acts."[73] What this latter prohibition means is that a witness' prior misbehavior may not be shown for the purpose of creating the inference that because he has committed wrongful acts he is not a truthful person.

This was not the purpose of defense counsel's proposed cross-examination of Daniel. What counsel wanted to show was that Daniel expected immunity from prosecution for possible crimes he may have committed in exchange for his willingness to give incriminating testimony against appellant. If counsel could show this, he could argue to the jury that Daniel was not an impartial witness, but had a predisposition to shade his testimony in favor of the prosecution and against appellant in order to further his own self-interest.

What we are speaking of is bias— "the slanting effect upon human testimony of the emotions or feelings of the witness toward the parties or the self-interest of

71. *Id.*

72. The trial took place in April 1969.

73. Civ.R. 43(g) (11) [b] provides:
   *Impeachment by Adverse Party.* A witness may be impeached by the party against whom he was called by contradictory evidence, or by evidence that his general reputation for truth is bad, or that his moral character is such as to render him unworthy of belief. He may not be impeached by evidence of particular wrongful acts, except that it may be shown by the examination of the witness or the record of a judgment that he has been convicted of a crime.

the witness in the outcome of the case."[74] Because this human tendency is so common and well known, reasonable latitude must be allowed in the cross-examination of a witness, and also in the introduction of extrinsic testimony, to bring out facts and circumstances which, when tested by human experience, tend to show that the witness may be biased.[75]

The fact that what is brought out, either on cross-examination or by extrinsic evidence, may tend to prove that the witness committed wrongful acts, does not make this method of showing bias impermissible. To show bias is indeed a form of impeachment. But the objective here is not to attack credibility on the theory that the witness, because he has committed wrongful acts, is not likely to be truthful. The main objective is to show that the witness may have expected leniency or immunity from prosecution if he gave testimony in favor of the state, and it is necessary to show the commission of wrongful acts in order to establish the basis for such an expectation. As we have stated before, when the primary objective of cross-examination is to establish bias, the fact that it may also be shown that the witness committed wrongful acts does not violate Civil Rule 43(g) (11) [b].[76] There is a plain distinction between attacking credibility in a general way, and showing motive to testify falsely as to a particular matter.[77]

■ In permitting defense counsel to ask Daniel only if he had been promised immunity from prosecution, but not whether he expected immunity or leniency, the trial judge was too restrictive. As stated by the Supreme Court of Arizona:

> The witness' belief that his testimony if favorable to the prosecution, will result in leniency or favorable treatment in connection with the crime committed by him is evidence of motive despite the fact that the witness' belief is mistaken, unreasonable or, indeed, is not based on any words or conduct of the prosecution. The test is the witness' expectation or hope of a reward, not the actuality of a promise by the State.[78]

In the recent case of Hughes v. United States,[79] it was held that—

> * * * the defense should always have the opportunity to show by way of cross-examination or otherwise that the actions of a government informer may have been impelled by an expectation of leniency in his own pending prosecution or sentence.[80]

We agree with this statement. But we extend it as well to the state witness who has no prosecution pending, but who has committed criminal acts which the state knows about. This is what defense counsel in this case was trying to ferret out— that Daniel had committed criminal acts for which he was not being prosecuted, and that he was motivated in testifying for the state by an expectation of continued immunity from prosecution.

In order to demonstrate such motivation, if it could be demonstrated, counsel ought to have been permitted to cross-examine Daniel as to his expectations of immunity or leniency, as we have stated. But counsel also had to show what such expectations related to in order for them to have

---

74. McCormick, Evidence § 40, at 82–83 (1954).

75. United States v. Lester, 248 F.2d 329, 334–335 (2d Cir. 1957); Alford v. United States, 282 U.S. 687, 691–692, 51 S.Ct. 218, 219–220, 75 L.Ed. 624, 627–628 (1931); Annot. 62 A.L.R.2d 610, 616 (1958); 3 Wigmore, Evidence §§ 948–949 (3d ed. 1940).

76. Smith v. State, 431 P.2d 507, 510 (Alaska 1967). See also Bentley v. State, 397 P.2d 976, 978 (Alaska 1965).

77. United States v. Lester, 248 F.2d 329, 334 (2d Cir. 1957).

78. Arizona v. Little, 87 Ariz. 295, 350 P.2d 756, 760 (1960).

79. 427 F.2d 66 (9th Cir. 1970).

80. Id. at 68.

any meaning. Thus, he ought to have been allowed, by cross-examination of Daniel or by other means, to show that Daniel had committed criminal acts for which he could have been but was not charged in a criminal prosecution. When the trial judge forbade counsel to explore this area, he effectively foreclosed him from showing that Daniel was possibly a biased witness.

The trial judge has the duty of keeping the trial of a case within reasonable bounds of relevancy and materiality. In this respect he must necessarily have a broad discretion in determining the scope of permissible examination of witnesses.[81] But here we feel that he exercised that discretion in too restrictive a way. Defense counsel was not given the latitude necessary to place the witness, Daniel, in his proper setting, so as to put to a test for the jury to determine his credibility and the weight to be given to his testimony.[82]

The judge erred in so limiting defense counsel's efforts to show bias on Daniel's part. This was not harmless error which could be disregarded.[83] Daniel was an important witness for the state, because he implicated appellant in the crime by identifying the weapons used in the robbery as having been left at Daniel's house by appellant and an accomplice until the night before the robbery. If counsel had been able to show that Daniel was biased in favor of the prosecution, we cannot say that this may not have made an appreciable effect on the jury's determination of guilt or innocence. The error in restricting counsel's efforts to show bias was prejudicial,[84] and a new trial must be ordered.

The judgment is reversed, and the case remanded for a new trial.

## APPENDIX

### Bibliography

Cohen, Commonwealth v. Hermankevich, Section (B) of the Pennsylvania Deadly Weapons Act, and Multiple Punishment, 31 U.Pitt.L.Rev. 476 (1970).

Commonwealth of Pennsylvania v. Hermankevich, 118 P.L.J. 24 (1970).

McElroy, Double Jeopardy: The Ephemeral Guarantee, 5 Crim.L.Bull. 375 (1969).

Case comment, 43 Notre Dame Law 1017 (1968).

McCleskey, The Dual Meaning of One Offense, 20 Baylor L.Rev. 218 (1968).

Grinberg, Double Jeopardy: Its History, Rationale and Future, 70 Dick.L.Rev. 377 (1966).

Comment, Twice in Jeopardy, 75 Yale L.J. 262 (1965).

Note, Consecutive Sentences in Single Prosecutions: Judicial Multiplication of Statutory Penalties, 67 Yale L.J. 916 (1958).

Statutory Implementation of Double Jeopardy Clauses: New Life for a Moribund Constitutional Guarantee, 65 Yale L.J. 339 (1956).

Lugar, Criminal Law, Double Jeopardy and Res Judicata, 39 Iowa L.Rev. 317 (1954).

Kirchheimer, The Act, the Offense and Double Jeopardy, 58 Yale L.J. 513 (1949).

Note, Double Jeopardy and the Multiple-Count Indictment, 57 Yale L.J. 132 (1947).

81. Fajeriak v. State, 439 P.2d 783, 785–786 (Alaska 1968).

82. *See* Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, 628 (1931).

83. Crim.R. 47(a) provides:
    *Harmless Error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

84. Love v. State, 457 P.2d 622, 629–632 (Alaska 1969).