James R. LEONARD, Appellant,

v.

STATE of Alaska, Appellee.

No. 5989.

Court of Appeals of Alaska.

Nov. 12, 1982.

Susan Orlansky, Charlene Lichtmann, Asst. Public Defenders, and Dana Fabe, Public Defender, Anchorage, for appellant.

W.H. Hawley, Jr., Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

James R. Leonard was convicted of two counts of misconduct involving weapons in the second degree, AS 11.61.210 (Counts I and III) and two counts of criminal mischief in the third degree, AS 11.46.484 (Counts II and IV). The evidence established that he fired a rifle at a cabin and pickup truck. He was subsequently sentenced to 360 days with 330 suspended, fined $3,000 with $2,000 suspended, and placed on one-year probation on Count I. He received concurrent suspended impositions of sentence on Counts II, III, and IV, conditioned upon his completion of alcohol screening and avoiding similar violations for one year.

Leonard appeals arguing that the trial court erred in denying him a mistrial when evidence that Leonard refused to take a polygraph examination was presented to the jury. He also contends that multiple sentences imposed for what he characterizes as a single course of conduct violates the double jeopardy provisions of our state and federal constitutions. Having considered the record we reject Leonard's contentions and affirm the judgment of the district court.

## THE POLYGRAPH TESTIMONY

Prior to trial, Leonard, through counsel, moved for a protective order barring reference to his discussions with a state trooper regarding whether he would take a polygraph examination. Leonard was present in court when this motion was made. It appears that Leonard denied shooting at the cabin and truck when first approached by the state troopers, and agreed to take a polygraph examination to establish his innocence. Later, he refused to take the polygraph examination. The trial court, relying

on *Pulakis v. State,* 476 P.2d 474 (Alaska 1970), granted the protective order. Thereafter, the following exchange occurred as Leonard was being examined by his own counsel during the defense case in chief:

LEONARD: At approximately two o'clock ... Mr. Wadman [a state trooper] come and knocked on my door.

Q. Okay. What did he ask you?

\* \* \* \* \* \*

A. He asked me if knowed ... anything about the Waner's ...

Q. Um-hum.

A. And I says no, I haven't been over there. Then he says, I'd like you to step outside. Fine. And so we both went outside. He stood there and had his pad in his hand and, [said] Mr. Leonard, I want to read you your rights. He read me my rights and said, "If you've done this, go ahead and tell me, I'll give you a ticket and we'll be going." I said no, I didn't do it. He said, well, ... will you take a polygraph test. I said yes, I would.

\* \* \* \* \* \*

DISTRICT ATTORNEY: Your Honor, counsel is the one that wanted a protective order against ...

\* \* \* \* \* \*

DEFENSE COUNSEL: Your Honor, could we argue this out of the presence of the jury, please?

The jury was excused and counsel debated the matter before the trial court. Defense counsel conceded that Leonard's volunteered statement regarding his willingness to take a polygraph examination violated the protective order that defendant had obtained. He requested that the trial court cure the error by instructing the jury to disregard references to polygraph examinations. The district attorney objected, pointing out that a week after the conversation summarized in Leonard's direct examination, Leonard refused to take the polygraph exam. The prosecutor argued:

A week later, he refused it. I want to be able to ask him that, and that's what I'm—he was in here when that protective order was granted and that's obviously for his benefit to bring out our offer to take a polygraph test and a week later he refuses it. Now he—I think he opened the door and it's going to have to come in.

The court responded:

THE COURT: [O]n the record [you] asked for a protective order...

DEFENSE COUNSEL: That's correct.

THE COURT: ... and the counsel for the state said that there would be no questions on this line and he would not do it. You have opened the door now to the polygraph through the witness who was in court at the time and knew that the subject of polygraph would not be mentioned. So it—as long as it has been mentioned, then the state will have the right, unless you bring it out, to explore the fact that a polygraph was offered and later refused.... I can do nothing when you and your witness violate the order that you asked for.

When the jury returned, defense counsel continued his examination of Leonard:

Q. Was that the last time you saw Mr. Wadman for awhile or did you see him several times?

A. No, he told me that day he would set up a polygraph and let me know.

Q. All right. Well, did you see him again?

A. Yes, he come back to my house several, several times.

\* \* \* \* \* \*

Q. He wanted to talk to you about the case again?

A. Yes.

Q. What about?

A. He come in there and asked me if I was going to take that polygraph test, that he would set it up a week later or so on and so forth, and I agreed on ... Monday or Tuesday when the man could come.

Q. He gave you a date and you said okay.

A. Well, he said yeah probably—maybe Monday or Tuesday, he'd let me know.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Mr. Leonard, . . . were you contacted again . . . by Mr. Wadman later on?

A. Yes. He come to my house and asked if I was going to take the polygraph on the following Monday, and I was very upset, I was tired. . . . So I says forget it, I'm not taking nothing, I'm tired of this, stay away from me.

The district attorney then cross-examined Leonard:

Q. Mr. Leonard, are you saying Mr. Wadman came over too many times and that's why you refused the polygraph?

A. Yes. . . .

Q. Well, wasn't there a final date set up and you refused to take it?

A. Yes, a month or a month and a half later after you've been at my house every other day . . .

&ast; &ast; &ast; &ast; &ast; &ast;

A. I got sick of it.

Q. You wanted to take a polygraph test, wanted to get this matter over, and then at the end, you refused then, is that correct?

A. Well, yes. . . .

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Okay. On October twenty-seven, you refused the polygraph, isn't that correct?

A. I don't remember.

During Trooper Wadman's rebuttal testimony the following exchange occurred with respect to the polygraph issue:

DISTRICT ATTORNEY: [D]id you offer a polygraph to Mr. Leonard?

A. I did.

Q. And what did he say about it?

A. He was agreeable to it.

Q. And why wasn't one given?

A. Because he later on decided that . . . he couldn't take it because of his back and he had therapy on Monday, Wednesdays and Fridays. So we moved the exam date to Tuesday. . . .

&ast; &ast; &ast; &ast; &ast; &ast;

A. I told him we would set up the polygraph at Trapper Creek so he wouldn't have to make a long trip. He was agreeable to that. Went back on the . . . twenty-seventh, and he refused the polygraph.

Q. Okay. Did he give a reason?

A. Said he . . . didn't want to take it and that he didn't do it and he wasn't going to take the polygraph.

Defense counsel cross-examined Trooper Wadman:

Q. Now, what happened—indicated in your notes that you say that he did agree to take a polygraph on the sixth of October, you scheduled it for the fourteenth.

A. That's right.

Q. And you wrote that in your book.

A. That's right.

Q. And you wrote that in your book after being at the Leonard residence, correct?

A. I was at his house, yes.

Q. Right. So that was an agreed upon date. What happened to that date?

A. He couldn't make it.

Q. I thought the date was agreed upon after he got there—after you got . . .

A. That's right. I told him that we'd set it up the following Tuesday, and then he said later on that he couldn't make it because of his therapy treatments and that we should . . .

Q. On Monday and Wednesdays?

A. Pardon?

Q. He said he couldn't make it . . .

A. Yeah, he—he . . .

Q. . . . Tuesday because of his therapy?

A. . . . had to do so some traveling. He had to do some traveling.

Q. Well, did he say it was because of his therapy that he couldn't make it Tuesday?

A. He was taking shots I believe on Monday, Wednesdays and Fridays.

Q. All right. Well, this is a Tuesday you said.

A. Um-hum.

Q. All right. Now, are you sure that in fact he said that you couldn't do it or that maybe your people couldn't show at that point?

A. That's—I think that's probably what happened.

Q. That your people couldn't show.

A. That it was a—it was too short of notice for the investigators.

Q. Aw. So it wasn't Mr. Leonard's fault at all that there wasn't a polygraph on the fourteenth.

A. Not on the fourteenth, no.

Q. Thank you.

The district attorney followed up this inquiry on redirect examination:

Q. What was the—why didn't you want to take one—when was the next date that was assigned?

A. I told him that—that I'd get back to him and we'd set something up, and then when I went back on the twenty-seventh, we were—we had—the investigator in Anchorage was ready to go with it. We'd set up two or three polygraphs in the area, and it was that time that he just said no, I'm—I'm—I'm not going to do it anymore.

During Leonard's closing argument to the jury he again introduced the polygraph issue in the following statement to the jury:

What about Trooper Wadman? Another example I think of bias toward Mr. Leonard. What were we told at the beginning about this polygraph situation? Well, he agreed to take one, but that—he was never around to take one, he didn't want to take one, he always avoided it, and then on cross-examination, we got down to the specifics, dates, times. Well, he

indicated that he was not available Monday, Wednesday and Friday because he had therapy on those days. Is that avoidance? I submit not. He indicated I am available on the other days, and there was a date scheduled for the other days. At first glimpse, Mr. Wadman tried to indicate that, well, yeah, he didn't want to go on that—the fourteenth of October, he didn't want to take the polygraph because he had to go somewhere, and then pressed, he had to admit, no, upon reflection, that was error. In fact, Mr. Leonard was available, it was the state that couldn't make the test happen. I submit to you that certainly the state can argue, well, he decided to take it and then he decided not to take it, that shows he's really guilty, it shows he really didn't want to take the test. I submit to you that Mr. Leonard gave you a very reasonable, very logical, very believable interpretation because what happens? On the first day, well, you did it, just tell me you did it and I'll sign you a statement. He cooperates. The guy comes back. He cooperates. The guy comes back. He cooperates. He's getting nowhere, absolutely nowhere. And then he wants him to go to Anchorage to make—to take a test. He got fed up and he said, no, forget it. I submit to you that that is not an indication of guilt. It's an indication of reasonable human behavior.

■ The results of polygraph examinations should not be received in evidence over objection. *Troyer v. State,* 614 P.2d 313, 319 n. 12 (Alaska 1980); *Pulakis v. State,* 476 P.2d 474, 479 (Alaska 1970). Even if there has been no objection, the trial court should ordinarily reject such evidence. *Id.* In *Troyer* and *Pulakis* our supreme court reviewed legal and scientific literature and concluded that polygraph testing had not been proven reliable. Despite its unreliability, polygraph evidence might be perceived by the jury as a complete answer to questions of credibility. Such evidence could also lull the jury into a false sense of security and result in the jury failing to carefully scrutinize conflicting witness testimony.

■ The parties agree that the rationale prohibiting the introduction of polygraph evidence should extend to preclude references to a witness' willingness or unwillingness to take a polygraph. We agree. The trial court properly entered a protective order precluding any such reference to a polygraph.

■ When Leonard volunteered his willingness to take such an exam the court was faced with a dilemma. If the court merely instructed the jury to disregard Leonard's comment, there was a substantial risk that the jury might nevertheless give Leonard the benefit of the inference which the protective order denied him; that is, because he was willing to take a polygraph he must necessarily be telling the truth. Consequently, the trial court did not abuse its discretion in permitting the prosecution to establish that Leonard was in fact not willing to take the polygraph. *See Williams v. State*, 629 P.2d 54, 59 (Alaska 1981) (state may be permitted to offer otherwise improper evidence to neutralize improper defense evidence). We believe both parties were properly permitted to discuss the circumstances surrounding Leonard's initial willingness to take the exam and his later refusal. We, therefore, find no error.

■ Nevertheless, we emphasize that polygraph examination evidence should be kept from the jury. Where this is impossible, an instruction merely telling the jury to disregard the reference is probably insufficient. Under such circumstances, a jury should, upon request, be told essentially that the polygraph has been subjected to substantial scientific scrutiny and is generally held to be unreliable as a method for determining truth or falsehood. Given this finding of unreliability, evidence of passing or failing a polygraph test is not admissible in evidence. The jury should not speculate about a witness' willingness or unwillingness to take a polygraph exam.

## DOUBLE JEOPARDY

Leonard complains that he received four separate convictions arising out of his single act of firing a rifle at a cabin and pickup truck. We believe *Whitton v. State*, 479 P.2d 302 (Alaska 1970), is dispositive of this claim.

In *Whitton,* the court established the following test to determine whether different statutory violations amount to the same offense or different offenses justifying separate punishments:

The trial judge first would compare the different statutes in question, as they apply to the facts of the case, to determine whether there were involved differences in intent or conduct. He would then judge any such differences he found in light of the basic interests of society to be vindicated or protected, and decide whether those differences were substantial or significant enough to warrant multiple punishments. The social interests to be considered would include the nature of personal, property or other rights sought to be protected, and the broad objectives of criminal law such as punishment of the criminal for his crime, rehabilitation of the criminal, and the prevention of future crimes.

If such differences in intent or conduct are significant or substantial in relation to the social interests involved, multiple sentences may be imposed, and the constitutional prohibition against double jeopardy will not be violated. But if there are no such differences, or if they are insignificant or insubstantial, then only one sentence may be imposed under double jeopardy. Ordinarily the one sentence to be imposed will be based upon or geared to the most grave of the offenses involved, with degrees of gravity being indicated by the different punishments prescribed by the legislature.

*Id.* at 312 (footnote omitted).

Applying the *Whitton* test, we are satisfied that the trial court properly concluded that there were sufficient and significant differences between the intent in firing at the truck and the cabin. We find that there were substantial and significant differences in the conduct. Firing at the truck risked damage to property and injury

to anyone in the vicinity of the truck. Firing at the cabin risked damage to that separate property and put at risk any persons who might be within the cabin, behind it, or in its immediate vicinity.

 Under these circumstances, we believe it was proper to punish Leonard separately for each count of misconduct involving weapons in the second degree in that his discharging a firearm in the vicinity of the cabin and in the vicinity of the truck endangered anyone who might be in either of those areas. Anyone who was in those areas would have been endangered by the two separate shots. *See* AS 11.61.210(a)(3). It was also proper to convict Leonard of two counts of criminal mischief in the third degree in that he intentionally damaged two separate pieces of property. *See* AS 11.46.484(a)(1). Furthermore, we agree with the trial court that, because Leonard's conduct involved a single transaction despite separate conducts and separate intents, concurrent rather than consecutive sentences were appropriate. *See Law v. State,* 624 P.2d 284, 287 n. 10 (Alaska 1981).

The judgment of the district court is AFFIRMED.