NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections @ appellate.courts.state.ak.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA


ARRON N. YOUNG,

                    Appellant,

          v.

STATE OF ALASKA,

                    Appellee.

Court of Appeals Nos. A-11006/15
Trial Court Nos. 4FA-08-3022 CR
& 4FA-08-2834 CR

O P I N I O N

No. 2422 — August 1, 2014

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Michael MacDonald, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Coats, Senior Judge.[*]

COATS, Senior Judge.

---

[*] Sitting by assignment made pursuant to article IV, section 11 of the Alaska Constitution and Administrative Rule 23(a).

Arron N. Young was convicted of three counts of attempted murder in the first degree and five counts of misconduct involving weapons in the first degree in connection with a shooting spree that occurred on a busy road in Fairbanks in 2008. Young appeals his convictions and sentence. We affirm Young's convictions for attempted murder in the first degree. But we conclude that Young's five counts of misconduct involving weapons in the first degree should merge into a single count. Because the merger of these counts affects Young's sentence, we remand this case to the superior court for resentencing.

*Factual and procedural background*

During the summer of 2008, there were several crimes in Fairbanks that the Fairbanks police attributed to an ongoing dispute between members of the Bloods and Crips gangs. On the afternoon of August 15, 2008, a shooting occurred on College Road in Fairbanks. During this incident, the occupants of a silver SUV shot at a green sedan in which Joseph Fainuu, Eddy Delarosa, and Jared Jermaine Askew were riding. The three men in the sedan were either self-identified members or associates of the Bloods gang. Arron Young, a member of the Crips gang, was later identified as the driver of the silver SUV and one of the shooters.

Numerous shots were fired as the two vehicles traveled down College Road. The bullets shattered the back window of the green sedan, and there were several bullet holes in the back of the car. Besides the men in the green sedan, several other people were endangered by the shots. David Throop testified that a bullet shattered his windshield as he was driving down College Road and that his hands were cut. Sarah O'Callaghan was walking with her bike when a bullet traveled past her head, and she

dove into a ditch. David Waters, Jamie Waters, and Kaylynn Waters were in a car that was struck by one of the bullets.[1]

Later that night, police apprehended Young. Young had a loaded gun in the front waistband of his pants. In Young's pocket, the police found a key to a vehicle matching the description of the silver SUV that was involved in the shooting. During the trial, a forensic firearm and tool mark examiner testified that some of the bullets and cartridge casings recovered from the crime scene were fired from the gun the police found on Young.

A grand jury indicted Young on three counts of attempted murder in the first degree[2] (one count for each of the men in the green sedan) and six counts of misconduct involving weapons in the first degree[3] (one for each of the five bystanders who were endangered, as well as a general count of misconduct involving weapons in the first degree that covered the entire incident).

Three witnesses identified Young as the driver of the SUV: Jason Gazewood, John Anzalone Jr., and Arles Arauz.

In his defense at trial, Young contended that he was not involved in the shooting and that he had been with his sister, Angie Young, when the shooting occurred. Young argued that the gun that was in his possession was given to him by another gang member who asked him to dispose of the weapon. At the conclusion of the trial, the jury convicted Young of all charges.

---

[1] David and Jamie Waters testified that they heard multiple shots but that only one bullet hit the car.

[2] AS 11.41.100(a)(1)(A); AS 11.31.100.

[3] AS 11.61.190.

The superior court sentenced Young to a composite term of 42 years to serve.

*Why we conclude the superior court did not err in admitting evidence of Jason Gazewood's identification of Young*

Young argues that the superior court erred in denying his motion to suppress Jason Gazewood's identification of him as a person involved in the College Road shooting. He contends that Gazewood's identification was tainted because it was the result of an unfairly suggestive photo lineup.

At an evidentiary hearing on Young's motion to suppress the identification, Gazewood testified that he was sitting in his car on College Road when he saw the green sedan pass him. He then saw a second vehicle approaching, in which he saw a man he believed was the shooter. He described the man as black or Samoan, with pulled-back hair. He made a statement to this effect to the police.

Three days later, Fairbanks police detective Peyton Merideth, the investigating officer in the case, went to Gazewood's office and showed him a photo lineup.

Gazewood had extensive prior experience as a prosecutor and is now a defense attorney. He had seen hundreds of photo lineups. Consequently, Detective Merideth did not give Gazewood any instructions about how to view the lineup. Although Gazewood was not told that the suspect's photo was in the lineup, he assumed that it was.

The lineup consisted of six photographs. Gazewood testified that, while he was looking at the photo lineup, he eliminated some of the photos immediately. He then deliberated between the photo of Young and two other photos of men with similar features. He narrowed his search down to two photographs. One of them was the photo

of Young. Gazewood moved his finger back and forth between the photos. While he had his finger on Young's photo, Detective Merideth said, "Go with your instincts." Gazewood assumed that, because he had his finger on Young's photo when Merideth spoke, Merideth wanted him to pick that photo. (Gazewood indicated that he was not watching Merideth at the time and did not know what Merideth was doing. And the superior court found that Merideth's comment was "unwitting.") Gazewood testified that he was very frustrated because he thought he was going to probably pick Young anyway. He thought that Merideth's comment had interfered with his deliberations.

The superior court concluded that the photo lineup procedure was not unnecessarily suggestive. The court found that there was nothing in the photo array to make Young's photo stand out from the other photographs. The court pointed out that another eyewitness, John Anzalone Jr., had picked out a different photograph in the lineup that resembled Young. The court also found that Gazewood had decided to identify Young in the photo lineup before Merideth made the comment, "Go with your instincts."

We conclude that the record in this case establishes that the identification procedure was unfairly suggestive. In *Tegoseak v. State*,[4] we discussed psychological research that provided insight into how identification procedures can become suggestive.[5] In particular, we pointed to research by Professor Gary L. Wells of Iowa State University. Based upon his research, Professor Wells suggested that lineups should be conducted by an officer who does not know who the suspect in the lineup is, so that the officer does not inadvertently, perhaps unconsciously, influence the identification.[6]

---

[4]   221 P.3d 345 (Alaska App. 2009).

[5]   *Id.* at 351-53.

[6]   *Id.* at 352.

In addition, Professor Wells recommended that the witness be told that the photo lineup might not contain a photograph of the person the police suspect — otherwise, the witness is likely to assume the suspect is in the lineup.[7]

In the present case, Detective Merideth did not follow these recommended procedures. Because Gazewood was experienced in photo lineup procedures, Detective Merideth did not give him any instructions. Gazewood testified that he assumed the suspect was in the photo lineup, even though Merideth did not tell him this. Furthermore, Detective Merideth knew that Young was the suspect in the case and he knew which photograph was the photograph of Young. Although the superior court found that Gazewood had already decided to select Young before Merideth told him, "Go with your instincts," the record does not support that finding. Gazewood testified that, although he was leaning toward picking the photograph of Young, he had not finished his deliberative process. He testified that when Merideth said, "Go with your instincts," he thought Young's photograph was the one Merideth wanted him to pick and he "didn't deliberate anymore." We conclude that the lineup procedure was unnecessarily suggestive.

The fact that we have concluded that the photo lineup procedure was unnecessarily suggestive does not mean that Gazewood's in-court identification of Young was inadmissible. A suggestive identification may still be admissible if under the totality of the circumstances it is nonetheless reliable.[8] The test used to determine whether an in-court identification is reliable is set forth in the United States Supreme

---

[7] *Id.*

[8] *Howe v. State*, 611 P.2d 16, 18 (Alaska 1980).

Court decision in *Manson v. Brathwaite*.[9] The *Brathwaite* Court identified five factors to be considered:

> • the witness's opportunity to view the perpetrator during the crime,
>
> • the witness's degree of attention,
>
> • the accuracy of any prior description given by the witness,
>
> • the witness's level of certainty when making the identification, and
>
> • the length of time between the crime and the witness's identification.[10]

In *Tegoseak*, we extensively examined and criticized the *Brathwaite* test in light of more current psychological research on eyewitness identification.[11] Young's argument on appeal is based on the criticisms we noted in that case. But we did not adopt a different test in *Tegoseak*,[12] and the superior court considered our criticisms of the *Brathwaite* test in the present case.

The superior court concluded that, even if the procedures used in the lineup were unnecessarily suggestive, the totality of the circumstances did not require suppression. The court found that Gazewood "had a sufficient opportunity to view the perpetrator during the criminal episode and had a sufficient degree of attention to the events." The court found that Gazewood was alerted to the incident when he saw the first car speed by. Gazewood then saw the other car come from behind and "took special note of the vehicle and its occupants." Gazewood had "three to eight seconds to witness the events" and he had "a good view of the events and saw the events unfolding up close." The court found that Gazewood had a good enough view of the perpetrator to

---

[9]   432 U.S. 98 (1977).

[10]   *Tegoseak*, 221 P.3d at 354 (citing *Manson*, 432 U.S. at 114).

[11]   *Id.* at 353-61.

[12]   *Id.*

generate a reasonably detailed description of him as a Black or Samoan man who had his hair pulled back.

The court found that Gazewood's identification of Young in the photographic lineup three days after the incident was "sufficiently close to the time of the events ... to be reliable," and that Gazewood "was operating with a sufficient degree of certainty" when he made the identification. The court also found that Gazewood realized the effect Detective Merideth's comment might have had on him and that Gazewood could "calibrate with precision how Merideth's comment may or may not have affected his identification."

In reviewing the trial court's findings in light of the *Brathwaite* factors, we conclude that the superior court did not err in finding that Gazewood's identification of Young was sufficiently reliable to allow Gazewood to make an in-court identification. Although, as we indicated in *Tegoseak*, we recognize the dangers inherent in eyewitness identification,[13] we also recognize that eyewitness testimony is often critical and is the kind of testimony that juries have traditionally been able to evaluate.[14] Among other things, the eyewitness is subject to cross-examination. In this case, Gazewood testified about the suggestiveness of the pretrial lineup procedure used in his identification of Young. It appears that, because of Gazewood's extensive prior experience with lineup procedure and his criticism of the procedure used in this case, his testimony was effective in establishing the problems with the photo lineup and the influence this procedure had on his identification. In addition, we note that Young could have called an expert

[13] *Id.* at 355, 359.

[14] *See Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716, 728 (2012).

witness to testify about the weaknesses of eyewitness identification in general and about the danger presented by the suggestive lineup in this case.[15]

*The superior court did not err in giving the pattern jury instruction on evaluating the testimony of a witness*

Young contends that the superior court erred in giving the pattern jury instruction on evaluating the testimony of a witness. He argues that the court should have given more specific instructions informing the jury of the unreliability of eyewitness testimony. The court declined to give Young's proposed instructions, finding that they set out a defense argument. The court concluded that the pattern jury instruction contained the appropriate factors for the jury to consider in evaluating witness testimony, such as the witness's memory and ability to observe events.

Young acknowledges that this court has previously affirmed convictions where the trial court gave the pattern instruction instead of a more focused instruction on eyewitness identification.[16] We adhere to those prior decisions and conclude that the trial court did not abuse its discretion in giving the pattern instruction in this case.

---

[15] In his pretrial motion to suppress Gazewood's identification, Young presented an expert witness on eyewitness identification. But he was unable to present this witness at trial because he did not give pretrial notice of the witness. Young has not argued that the trial court erred in refusing to allow the expert witness to testify because of this discovery violation.

[16] *See McGee v. State*, 614 P.2d 800, 804 (Alaska 1980); *see also Dayton v. State*, 598 P.2d 67, 68 (Alaska 1979); *Larson v. State*, 656 P.2d 571, 575-76 (Alaska App. 1982); *Williams v. State*, 652 P.2d 478, 480 (Alaska App. 1982).

*The superior court did not err in allowing witness John Anzalone Jr. to make an in-court identification of Young*

John Anzalone Jr. witnessed the shooting. Anzalone initially was not able to identify Young as a shooter. Before the grand jury, he also failed to identify Young from a photo lineup and, in fact, picked someone other than Young. But during the trial, Anzalone contacted the State, indicating that he had identified Young as a shooter after seeing his photograph on the news.

Young argued in superior court that Anzalone should not be allowed to make an in-court identification of Young because Young would be the only black male sitting at the defense table. Young also argued that the fact that Anzalone saw Young's photo on television before the identification was likely to have affected his identification.

The superior court rejected Young's arguments, stating that it was not impermissible for a witness who failed to identify a defendant in a lineup to make an in-court identification later. The court reasoned that Young could cross-examine Anzalone and bring out the factors that might cast doubt on Anzalone's identification, including Anzalone's failure to identify Young in the photo lineup. And the court pointed out that, in a criminal trial, the defendant is almost always the only person at the defense table aside from his attorney. We find that the court did not abuse its discretion by permitting Anzalone to make an in-court identification.

*The superior court did not err in denying Young's motion for a mistrial*

As we have previously explained, Young's defense was alibi. He claimed that he was at his sister's house at the time of the shooting. Because Young's defense was alibi, the witnesses at the scene who could identify Young as a shooter were critical to the State's case.

Arles Arauz was one of those witnesses. At the time of the shooting, Arauz was riding in a car that was near the green sedan that was the target of the shooting. Arauz and the other two occupants of that car were following the green sedan because they planned to share a hotel room with the occupants of the sedan.

At Young's trial, on direct examination, Arauz testified that he was familiar with Arron Young because he knew him from school. Arauz conceded that, when he was questioned shortly after the shooting incident by Detective Merideth, he told Merideth he did not know who had done the shooting. But when Arauz testified at grand jury, he was shown a photo lineup containing Young's photo and identified Young as the shooter.

When Young's attorney cross-examined Arauz, the defense attorney asked Arauz to acknowledge that, right after the shooting, Arauz told Detective Merideth he did not see who had done the shooting. Arauz responded to the defense attorney's questions by asserting that he *had* actually seen (and identified) Young as one of the shooters but he had told Detective Merideth the opposite because he "didn't want to be a snitch."

Young's attorney then sought to establish that Arauz had only identified Young when he testified before the grand jury, after he learned that Young was a suspect. The defense attorney also sought to establish that Arauz had a motive to accuse Young because of an earlier grudge.

In response to this line of questioning, Arauz testified that, actually, on the day of the shooting, a different detective had shown him a photo lineup that contained a picture of Young and he had identified Young. This information came as a surprise to both the defense attorney and to the prosecutor.

This other detective, David Elzey, later provided a report containing an explanation of why there was no record of Arauz's identification of Young on the day

of the shooting. According to Elzey's report, Arauz had agreed to talk to Elzey only on condition that their conversation would be "off the record." Arauz told Elzey that he had not told the truth when he spoke with the other officer (Merideth) — that he had withheld his knowledge that Young was one of the shooters because he did not want to be a "snitch." Arauz told Elzey that he had indeed seen Young driving the SUV and shooting at his friends in the green sedan. He said that he was sure it was Young because he had gone to school with Young.

Detective Elzey did not record this interview with Arauz, nor did he summarize Arauz's statements in his initial police report, because he had promised Arauz confidentiality. But according to Elzey's report, Elzey "strongly suggested" that Arauz tell the truth when he testified at grand jury. After Arauz testified at grand jury and identified Young, Elzey concluded that everything had worked out satisfactorily, and he decided that it was unnecessary to disclose Arauz's earlier identification of Young.

After Elzey's report was produced, Young's attorney moved for a mistrial. The defense attorney argued that the State's failure to disclose this information earlier violated Young's right to discovery under Alaska Criminal Rule 16 and his right to due process. The defense attorney further argued that his presentation of the defense case had been prejudiced by the State's failure to reveal Arauz's initial identification of Young on the day of the shooting.

The attorney pointed out that this new information had weakened his cross-examination of Arauz, because that cross-examination had been premised on the assumption that Arauz had not identified Young as one of the shooters until after Young was publicly named as a suspect. The defense attorney also asserted that, had he been aware of the information about Arauz's earlier identification, he and Young might not have chosen to present an alibi defense, but might instead have argued that the shooting was justified.

Under Criminal Rule 16(b)(1)(A)(i), the State is required to disclose to the defense "written or recorded statements and summaries of statements" made by "persons known by the government to have knowledge of relevant facts." The superior court concluded that the State was not required under this rule to disclose Arauz's initial identification of Young to the defense because the police had prepared no "written or recorded statement" of the identification.

We have previously held that Criminal Rule 16(b)(1)(A)(i) does not invariably require the prosecution to disclose unrecorded oral statements of witnesses made during pretrial preparation shortly before trial, at least where there has been no bad faith on the part of the prosecutor.[17] But in this case, as the superior court found, the State provided Young with police reports affirmatively stating that Arauz had *not* been able to identify Young on the day of the shootings — even though Detective Elzey knew at the time the reports were generated that this was not true. In other words, the State presented Young with reports that affirmatively misstated information that was critical to his defense, and Young relied on those reports, to his detriment, in litigating his case. This conduct violated both the text and spirit of Criminal Rule 16, which is designed to prevent precisely this type of unfair surprise.

We nevertheless conclude that, under the facts of this case, the superior court's remedies for this violation were sufficient and that a mistrial was not warranted. The superior court found that the State's failure to disclose Arauz's initial identification unfairly surprised Young. To remedy that unfairness, the court granted Young a continuance of trial and precluded the State from offering the testimony of Detective Elzey and another witness to corroborate Arauz's testimony.

---

[17] *Sivertsen v. State*, 963 P.2d 1069, 1071-72 (Alaska App. 1998), *disapproved on other grounds*, 981 P.2d 564 (Alaska 1999).

Although the State bears the burden of disproving that the defendant was prejudiced by a mid-trial discovery violation, the defendant must first set forth some plausible way in which his defense was prejudiced.[18] As we explained, the major prejudice Young alleged was that had he been aware that Arauz identified him on the day of the shootings, he might have abandoned his defense of alibi and argued that his conduct was justified.

The superior court was skeptical of Young's claim that, but for the State's discovery violation, he would have presented a justification defense because that defense was completely inconsistent with Young's defense of alibi. A justification defense was also completely inconsistent with the State's evidence, which showed that Young had been driving a silver SUV and firing shots at a car that was trying to get away.

When the superior court questioned the viability of a justification defense under the facts of Young's case, Young did not make an offer of proof or ask to present information to the court *in camera* to establish that he had evidence to support the defense. Young's failure to make this offer of proof cannot be attributed to inadequate time to prepare argument and evidence on the issue because the court recessed the trial for four days to give Young time to conduct relevant investigation and to assess the potential prejudice of the State's discovery violation to his case.

Given this record, we conclude that the superior court could properly reject Young's claim that he would have presented a justification defense if he had known about Arauz's earlier identification of Young. Moreover, the remedies the court granted for the State's late disclosure of Arauz's initial identification were adequate to cure other

---

[18] *Bostic v. State*, 805 P.2d 344, 348-49 (Alaska 1992); *Jurco v. State*, 825 P.2d 909, 916-17 (Alaska App. 1992).

potential prejudice to the litigation of Young's case. We accordingly conclude that the superior court did not abuse its discretion by denying Young's motion for a mistrial.[19]

*Young's claim of cumulative error*

Young argues that, even if we do not find that the trial court committed reversible error with regard to any of his prior claims, we should reverse his convictions based upon cumulative error. "Cumulative error requires reversal when the impact of errors at trial was so prejudicial that the defendant was deprived of a fair trial, even if each individual error was harmless."[20] Since we do not find that the superior court committed any error, we have no basis to reverse under the doctrine of cumulative error.

*Young's six convictions for weapons misconduct must merge*

As we explained earlier, Young was convicted of six counts of weapons misconduct in the first degree under AS 11.61.190(a)(2) — *i.e.*, shooting a firearm from an operating motor vehicle under circumstances where there was a substantial and unjustifiable risk of injury to persons or damage to property. These six counts included one count for each of the five bystanders endangered by the shooting, plus one general count that covered the shooting as a whole.

At sentencing, the superior court merged the general count that covered the shooting as a whole, but the court entered separate convictions on the remaining five counts (the counts that were based on the danger to the five bystanders).

Young argues that all of these convictions must merge into a single conviction — that the act of discharging a firearm from a motor vehicle constitutes a single offense under AS 11.61.190(a)(2), even if that conduct creates a risk of injury to

---

[19] *See Phillips v. State*, 70 P.3d 1128, 1138 (Alaska App. 2003).

[20] *Drumbarger v. State*, 716 P.2d 6, 16 (Alaska App. 1986).

more than one person. To resolve Young's argument, we must determine the gravamen of the offense — *i.e.*, the essential conduct that the statute criminalizes.

Alaska Statute 11.61.190(a) prohibits "discharging a firearm from a propelled vehicle while the vehicle is being operated and under circumstances manifesting a substantial and unjustifiable risk of physical injury to a person or damage to property." The legislative history of this statute shows that it was directed at drive-by shootings.[21]

Our criminal code already has provisions — the assault statutes found in AS 11.41.200-.230 — that prohibit the reckless creation of danger to particular individuals. Under Alaska law, when a person commits a single act that recklessly endangers multiple people, this act will support multiple convictions for assault — one for each person endangered.[22]

In contrast, the drive-by shooting statute was aimed at a particular reckless activity that, in and of itself, creates a generalized public danger. According to the legislature's sectional analysis of the proposed law, the legislature viewed a drive-by shooting as "inherently dangerous conduct," regardless of whether any person was actually injured, or was even placed in fear, by the shooting.[23]

In other words, the legislature did not view the drive-by shooting law as an alternative or aggravated form of assault. The crime is the act of shooting itself, even

---

[21]    *See* fiscal note analysis of H.B. 396 (Jan. 13, 1992); sectional analysis of C.S.H.B. 396; Dep't of Law memorandum on H.B. 396, addressed to Rep. Dave Donley, Chairman of the H. Judiciary Comm. (Jan. 14, 1992) (all included in the 1992 H. Judiciary Comm. file on H.B. 396).

[22]    *See Cooper v. State*, 595 P.2d 648, 649 (Alaska 1979); *Hathaway v. State*, 925 P.2d 1343, 1346 (Alaska App. 1996).

[23]    *See* sectional analysis of C.S.H.B. 396 (included in the 1992 H. Judiciary Comm. file on H.B. 396).

when there is no victim. It was therefore improper for the State to charge Young with a separate count of weapons misconduct for each person who was endangered by the shooting.

We acknowledge that, under the facts of this case, the State might properly have charged Young with a separate count of *assault* for each bystander who was either injured or placed in fear of imminent injury by Young's actions. As we have explained, a single assaultive act that endangers multiple people will support multiple convictions for assault under Alaska law. But a single act of discharging a gun from a motor vehicle remains a single crime under AS 11.61.190(a)(2), regardless of how many people (or how many items of property) are endangered by the discharge.

We further acknowledge that, at least potentially, Young's case involved two or more discrete acts of discharging a gun from a motor vehicle. Young and his accomplices chased their victims (the occupants of the green sedan) through the streets of Fairbanks for over two miles. Depending on what happened during that chase, it is conceivable that Young and his companions fired at the green sedan, stopped firing, and then began firing again — with a significant break in time and circumstance between each act.

We used this test in *Soundara v. State*[24] to evaluate whether a defendant's assaultive conduct constituted one continuing assault or two separately punishable assaults,[25] and in *Williams v. State*[26] to evaluate whether a defendant's sexually abusive

---

[24]   107 P.3d 290 (Alaska App. 2005).

[25]   *Id.* at 299.

[26]   928 P.2d 600 (Alaska App. 1996).

conduct constituted one continuing act of sexual abuse or two separately punishable acts.[27]

But in Young's case, the State made no attempt to evaluate Young's conduct in this fashion when it formulated the weapons misconduct charges, and the trial jury was not asked to evaluate Young's conduct in this fashion when it deliberated on those charges. Thus, even if the evidence in Young's case theoretically might have been interpreted in a way that would support two or more separate convictions for discharging a firearm from an operating motor vehicle, the jury's verdicts left this issue unresolved — and, at this juncture, any ambiguity must be resolved in favor of the accused. In other words, only a single conviction for weapons misconduct may be entered against Young.[28]

To the extent that our decision in *Leonard v. State*[29] is inconsistent with this analysis, it is disapproved.

*Young's excessive sentence claim*

Young also appeals his sentence, arguing that it is excessive. Given our decision that Young's convictions for misconduct involving weapons in the first degree must merge, the superior court must resentence him. We accordingly do not decide at this time whether Young's sentence is excessive.[30]

---

[27] *Id.* at 604.

[28] *See Soundara*, 107 P.3d at 299; *see also Simmons v. State*, 899 P.2d 931, 937 (Alaska App. 1995).

[29] 655 P.2d 766 (Alaska App. 1982).

[30] *See Allain v. State*, 810 P.2d 1019, 1023 (Alaska App. 1991).

*Conclusion*

The convictions for attempted murder in the first degree are AFFIRMED. On remand the superior court shall merge the convictions for misconduct involving weapons in the first degree and resentence Young. We do not retain jurisdiction.