NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>*. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| JOSE MIGUEL CONTRERAS EVANGELISTA, | | Court of Appeals No. A-13636 |
| Appellant, | | Trial Court No. 3AN-19-04920 CR |
| v. | | |
| | | **O P I N I O N** |
| STATE OF ALASKA, | | |
| Appellee. | | No. 2778 — May 31, 2024 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, under contract with the Public Defender Agency, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. RuthAnne Beach, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Wollenberg, Harbison, and Terrell, Judges.

Judge TERRELL.

Jose Miguel Contreras Evangelista fired two rounds of gunshots at his neighbors' occupied trailer home. For this conduct, a jury found Evangelista guilty of two counts of attempted first-degree murder, two counts of second-degree weapons

misconduct, and seven counts of third-degree assault.[1] At sentencing, the superior court merged two of the assault counts into the attempted murder convictions and sentenced Evangelista to a composite term of 47 years with 10 years suspended (37 years to serve).

Evangelista raises three claims on appeal.

First, Evangelista argues that the superior court impermissibly shifted the burden of proof when responding to a jury question. While the court's response was inartfully worded in one respect, we conclude that the jury instructions, as a whole, properly informed the jury of the applicable law. Accordingly, we conclude that Evangelista has not demonstrated plain error.

Second, Evangelista argues that the superior court violated the prohibition on double jeopardy when it declined to merge the second-degree weapons misconduct counts into the convictions for attempted first-degree murder. Because these convictions constitute separate offenses under the Alaska and federal double jeopardy clauses, we conclude that the court was not required to merge these convictions.

Finally, Evangelista claims that the superior court's sentencing remarks were insufficient and that his composite sentence is excessive. After reviewing the sentencing record, we conclude that neither contention has merit.

*Background facts and proceedings*

Rosalin Diaz de Mercado ("Diaz"), her husband Ramon Mercado, and their three sons lived in a trailer home next door to Evangelista. At the time of the offenses, the Mercado-Diaz family and Evangelista had been neighbors for several years. The inception of their relationship was friendly, but they later had what Evangelista's counsel described as a "falling out." As a result, the Mercado-Diaz family had a security camera installed outside of their trailer, trained on Evangelista's trailer.

---

[1] AS 11.41.100(a)(1)(A) & AS 11.31.100(a), AS 11.61.195(a)(3)(B), and AS 11.41.220(a)(1)(A), respectively.

One night in May 2019 when her husband was out of town working, Diaz, her three children, and one of her children's friends were in bed for the night when multiple rounds of gunfire struck the trailer. Diaz's oldest son, eighteen-year-old Juan Mercado, called 911 and reported that his neighbor was shooting at their trailer.

Anchorage Police Officers Aaron Richwine and Noel Senoran were among the officers dispatched, and they entered the Mercado-Diaz trailer upon their arrival at the scene. After the officers were inside for a few minutes, a second series of gunshots erupted. Multiple bullets struck the trailer, with one bullet nearly hitting Officer Richwine's face.

Meanwhile, additional officers were outside the trailer. When the second round of shots occurred, officers saw muzzle flashes coming from Evangelista's trailer. Officer Jose Maldonado laid on the Mercado-Diaz family's porch with his rifle pointed at Evangelista's trailer. Another officer flashed a light into Evangelista's window, permitting Officer Maldonado to see a man running toward the back of the trailer.

The police set up a perimeter around Evangelista's trailer while other officers evacuated the neighborhood and closed the road to prevent people from coming and going. After unsuccessful attempts to contact Evangelista, officers contacted a SWAT team for assistance. Following a nearly five-hour standoff, Evangelista surrendered and was arrested. Officers did not find anyone else inside the trailer.

Evangelista was indicted on two counts of attempted first-degree murder, two counts of second-degree weapons misconduct, and seven counts of third-degree assault. The attempted murder counts were for shooting at Diaz prior to the police arriving (Count I) and for shooting at Diaz, Juan Mercado, and Officer Richwine when they were together inside the trailer (Count II). The second-degree weapons misconduct counts were for firing a round of bullets into the Mercado-Diaz trailer prior to the police arriving (Count III) and for firing into the trailer after the police arrived (Count IV). The seven counts of third-degree fear assault were for recklessly causing a number of individual victims fear of imminent, serious physical injury by means of a dangerous

instrument — Diaz (one count for shots fired before police arrived, and one count for shots fired after they arrived), her three sons, and Officers Richwine and Senoran.

Evangelista's case proceeded to a jury trial. The State's witnesses testified to the version of events described above.

Evangelista testified and denied having fired any of the shots. Evangelista testified that he met a man he knew only as "Jimmy" at the Anchorage Rescue Mission and asked Jimmy to help him fix up his trailer in exchange for money and a place to stay. Evangelista testified that when he came home from work, he could tell that Jimmy had been drinking. He and Jimmy argued over money. Evangelista testified that he went to his bedroom, drank several beers, and took Tylenol PM and prescription pain medication. He testified that he fell asleep watching a movie while wearing headphones. Evangelista stated that he was unaware of what was going on outside his trailer until the early morning hours when the police detonated several devices outside his trailer in an effort to force him outside. Evangelista asserted that Jimmy was the likely shooter. Evangelista claimed in his closing argument that the police efforts to set up a perimeter were insufficient and that Jimmy had managed to escape undetected from the trailer, thus explaining why police did not find anyone else in Evangelista's trailer.

When discussing the jury instructions, the superior court stated that the attempted first-degree murder charge in Count II raised factual unanimity concerns by charging conduct directed at three victims. The court explained that the State's proposed instruction and verdict form did not cure the problem because it did not ask the jury to identify which, if any, of the three named victims it found Evangelista had intended to murder. To address this, the court issued a verdict form that instructed the jury to circle the names of those victims Evangelista had targeted. The verdict form read:

> We, the jury, find the defendant, JOSE MIGUEL CONTRERAS EVANGELISTA,
>
> [Guilty or Not Guilty]

of Attempted Murder In The First Degree as charged in Count II. If you find the defendant guilty, please indicate which individual or individuals the guilty verdict relates to by circling the name or names of the following persons: Ros[a]lin Diaz, Juan Mercado, Officer Aaron Richwine.

During deliberations, the jury submitted a note with three related questions about the verdict form for Count II:

> What is [the] significan[ce] of circled names in Count II? Does the jury need to agree on all [the] names? What is the next step for Count II if the jury agrees on at least 1 or 2 of the three named persons[?]

The superior court convened the parties and read its proposed response. Evangelista did not object to the court's proposed response, which stated:

> In order for the jury to find the defendant guilty on Count II, the jury must find unanimously that at least one of the alleged victims was the subject of attempted murder in the first degree. See Instruction No. 17[.] The court must know which alleged victim or victims the defendant's conduct relates to. Hence you must circle the name of that person or persons. On the other hand, if you unanimously agree that [the] defendant did not commit attempted murder in the first degree as to all of the alleged victims, you must return a verdict of not guilty on Count II.

The jury convicted Evangelista on all charged counts. The jury circled Diaz's name on the Count II verdict form. The jury also found four aggravating factors.

At sentencing, the superior court merged two of the assault counts with Evangelista's convictions for attempted first-degree murder.[2] The court then analyzed the *Chaney* criteria and sentenced Evangelista on the remaining nine counts to a composite term of 47 years with 10 suspended (37 years to serve).

---

[2]   The superior court merged the attempted first-degree murder and third-degree assault counts which were based on Evangelista's act of shooting at Diaz before the police arrived. The court also merged the attempted first-degree murder and third-degree assault counts which were based on his act of shooting Diaz after the police arrived.

*Why we conclude that the superior court's response to the jury's question does not constitute plain error*

On appeal, Evangelista argues that the superior court's response to the jury question regarding the verdict form for Count II shifted the burden of proof to the defense and impermissibly raised the standard for acquittal. Specifically, he challenges the last sentence of the court's response, which stated: "On the other hand, if you unanimously agree that [the] defendant *did not commit attempted murder* in the first degree as to all of the alleged victims, you must return a verdict of not guilty on Count II."[3] He argues that this language wrongly implied that the jury could only acquit him on this count if it affirmatively found that he was innocent.

"[W]hen an appellate court reviews claims of error involving jury instructions, the question is not whether the challenged jury instruction might contain language that could be misinterpreted."[4] Instead, "the question is whether the jury instructions, *taken as a whole*, properly informed the jury of the applicable law."[5] Furthermore, because Evangelista failed to object to this instruction below, he must demonstrate plain error.[6]

If taken out of context, we agree that the superior court's response — that the jury should return a not guilty verdict if it "unanimously agree[d] that [the] defendant did not commit attempted murder" — could be read to suggest that the jury should only return a "not guilty" verdict if it affirmatively concluded that Evangelista

---

[3]   Emphasis added.

[4]   *Kangas v. State*, 463 P.3d 189, 194 (Alaska App. 2020).

[5]   *Id.* (emphasis in original) (first citing *Lynden Inc. v. Walker*, 30 P.3d 609, 617 (Alaska 2001); and then citing *Baker v. State*, 905 P.2d 479, 490 (Alaska App. 1995)).

[6]   *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011) ("Plain error is an error that (1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial.").

was innocent. It therefore would have been better if the court had instructed the jury, for example, "If you unanimously agree that the State *has failed to prove the defendant's guilt beyond a reasonable doubt* as to all of the victims, you must return a verdict of not guilty on Count II."

But the jury instructions, taken as a whole, informed the jury that the State bore the burden of proving each element beyond a reasonable doubt. The jury instructions explained the burden of proof and the presumption of innocence:

> To overcome the presumption of innocence, the prosecution must prove every element of the crimes charged beyond a reasonable doubt.
>
> . . . The prosecution always has the burden of proving the defendant guilty beyond a reasonable doubt. This burden never shifts throughout the trial. The defendant is not required to prove his or her innocence or to produce any evidence at all.

The elements instruction for the attempted first-degree murder count also clearly explained that the jury should return a "not guilty" verdict unless the jury unanimously agreed that the State proved every element beyond a reasonable doubt with respect to at least one of the victims. And the prosecutor explained in his closing argument that the State bore the burden of proving all the charges beyond a reasonable doubt.

To accept Evangelista's argument on appeal, we would be required to adopt the implausible conclusion that the jury ignored these prior invocations of the beyond a reasonable doubt standard based on an ambiguous sentence in the court's response to a jury question about a separate issue. We would be required, in other words, to read the challenged language in isolation, rather than in the context of the other instructions provided to the jury, in contravention of our well-established case law.

Because the jury instructions, taken as a whole, informed the jury of the applicable law, Evangelista has failed to show that the court committed plain error.

*Why we affirm the superior court's decision not to merge the attempted first-degree murder and second-degree weapons misconduct counts*

At sentencing, the superior court considered whether the second-degree weapons misconduct counts (knowingly discharging a firearm at or in the direction of a dwelling) should merge with the convictions for attempted first-degree murder, *i.e.*, whether each second-degree weapons misconduct count should merge with the attempted first-degree murder count stemming from the same round of shots. After raising the issue *sua sponte*, the superior court declined to merge the two sets of counts, finding that the two statutes vindicated sufficiently different societal interests. The court noted that while attempted murder narrowly protects against harm to a specific individual, weapons misconduct protects against "the more generalized risk [posed by] shooting into a dwelling." On appeal, Evangelista contends that this ruling violated his rights under the Alaska and federal double jeopardy clauses by imposing multiple punishments for the same offense.

We begin with Evangelista's claim under the Alaska Constitution. In *Whitton v. State*, the Alaska Supreme Court announced the test for determining whether two separate crimes comprise a single offense under Alaska's double jeopardy clause in Alaska Constitution Article I, Section 9.[7] Under this test, courts must first compare the different statutes "as they apply to the facts of the case," to determine whether they "involved differences in intent or conduct."[8] Next, courts must consider any differences "in light of the basic interests of society to be vindicated or protected."[9] If differences between the statutes are "significant or substantial in relation to the societal interests

---

[7]     *Whitton v. State*, 479 P.2d 302 (Alaska 1970).

[8]     *Id.* at 312.

[9]     *Id.*

involved," then the court may impose separate convictions.[10] However, if there are no functional differences between the statutes, or if the differences identified "are insignificant or insubstantial," then the two statutes are considered the "same offense" under Alaska's double jeopardy clause.[11]

Evangelista's convictions for attempted first-degree murder and second-degree weapons misconduct stem from the same acts — firing bullets at the Mercado-Diaz family's trailer before and after the police arrived. Evangelista was convicted of attempted first-degree murder under AS 11.41.100(a)(1)(A) and AS 11.31.100(a) on the theory that he intended to cause another person's death and took a substantial step toward that objective. Evangelista was convicted of second-degree weapons misconduct under AS 11.61.195(a)(3)(B) on the theory that he knowingly discharged a firearm at or in the direction of a dwelling.

Evangelista contends that these statutes are similar because they both protect individuals from either harm or the risk of harm. But these statutes also have significant differences. Attempted murder requires that the defendant act with the specific intent to kill an individual.[12] In contrast, second-degree weapons misconduct does not require proof that the defendant intended to cause harm to an individual, or that the dwelling was even occupied when the shooting occurred.[13]

Indeed, the legislative history of AS 11.61.195(a)(3)(B) demonstrates that this subsection of the weapons misconduct statute was intended to address the generalized threat to public safety posed by discharging firearms into buildings without

---

[10] *Id.*; *Rofkar v. State*, 273 P.3d 1140, 1143 (Alaska 2012).

[11] *Whitton*, 479 P.2d at 312; *Rofkar*, 273 P.3d at 1143.

[12] AS 11.41.100(a)(1)(A) & AS 11.31.100(a).

[13] *See* AS 11.61.195(a)(3)(B).

regard for the presence of people in the target building or other nearby buildings.[14] When the legislature amended this provision in 1997 to its current form, the bill's sponsor emphasized that the amended language would make it a felony offense to discharge a firearm into a building regardless of whether the shooter knew the building was occupied at the time.[15] And much of the discussion in the legislature focused on how this offense would encompass certain types of shootings that the assault statutes — which require an individual target — did not reliably cover.[16]

Thus, while attempted murder is more narrowly focused on protecting an individual from harm, second-degree weapons misconduct under AS 11.61.195(a)(3)(B) more broadly focuses on protecting neighborhoods from the

---

[14] *See* Minutes of Senate Judiciary Comm., Senate Bill 70, Tape 97-24, Side A at 00, introductory comments of Senator Dave Donley (Mar. 26, 1997) (explaining that shooting at a dwelling without proof that the shooter knew the dwelling was occupied was only a misdemeanor and stating that the bill was intended to make such conduct a felony); *id.* at 385, comments of Senator Drue Pearce (stating that she did not believe "the people involved in the drive-by shootings consider whether the buildings are occupied" and expressing a desire that such conduct be a felony); Minutes of Senate Health, Education and Social Services Comm., Senate Bill 70, Tape 97-16, Side A at 478, comments of Senator Dave Donley (Feb. 21, 1997) (explaining that the bill addresses "a gap" in the criminal law by making the discharge of a firearm into a building when there is a "high possibility that someone is living in that building" a felony).

[15] Minutes of Senate Judiciary Comm., Senate Bill 70, Tape 97-24, Side A at 00, introductory comments of Senator Dave Donley (Mar. 26, 1997).

[16] *See* Minutes of Senate Judiciary Comm., Senate Bill 70, Tape 97-24, Side A at 373, testimony of Assistant Attorney General Anne Carpeneti (Mar. 26, 1997) (stating that under the existing assault statutes, "if a person is put in fear, the offender would be charged with assault"); *id.* at 373, comments of Senator Dave Donley (stating while assaults require a victim, the bill makes it so that second-degree weapons misconduct "does not require that a real person be present during the shooting").

generalized threat of gun violence.[17] These differences between the two statutes appear "significant or substantial."

But that does not end our inquiry, as *Whitton* instructs that we also evaluate differences between these statutes in the context of Evangelista's case. Evangelista's convictions arose from two separate acts of shooting at the Mercado-Diaz trailer. When the first shooting occurred, the Mercado-Diaz family occupied the trailer. When the second shooting occurred, the Mercado-Diaz family *and* Officers Richwine and Senoran occupied the trailer. Additionally, other police officers had arrived and set up a perimeter around Evangelista's trailer.

Evangelista was convicted of attempted first-degree murder for shooting at one person, Diaz. However, Evangelista was convicted of weapons misconduct for shooting at a dwelling that had many people inside it and was located in a dense residential area. The attempted murder charges targeted the specific threats to Diaz's life, but the weapons-misconduct charges targeted the more generalized threats to the Mercado-Diaz family, their neighbors, and the police officers. These case-specific differences reinforce that attempted first-degree murder and second-degree weapons misconduct constitute separate offenses.

---

[17] In *Young v. State*, 331 P.3d 1276, 1284 (Alaska App. 2014), we examined AS 11.61.190(a)(2), a separate theory of weapons misconduct that criminalizes shooting a firearm from a vehicle under circumstances that create a substantial and unjustifiable risk of harm to persons or property. We analyzed the legislature's purpose in enacting this provision and concluded that it targeted conduct that created "a generalized public danger . . . regardless of whether any person was actually injured, or was even placed in fear, by the shooting." *Id. Accord Her v. State*, 2018 WL 4492835, at *5 (Alaska App. Sept. 19, 2018) (unpublished). Our reasoning in *Young* is persuasive in Evangelista's case. Like the statutory provision in *Young*, AS 11.61.195(a)(3)(B) targets the generalized community threat of discharging a firearm rather than the specific harm to an individual.

For these reasons, the differences between these statutes are "significant or substantial in relation to the societal interests involved," warranting separate convictions under the Alaska Constitution.[18]

We now turn to Evangelista's double jeopardy claim under the United States Constitution. Under federal law, the permissibility of imposing separate convictions hinges on legislative intent — *i.e.*, "whether the legislature intended to preclude separate conviction and punishment for two offenses."[19] The primary tool of statutory interpretation for discerning this intent is the test set out in *Blockburger v. United States*.[20] Under the *Blockburger* test, separate convictions are presumptively warranted if either statute contains an element that the other statute does not.[21] While the *Blockburger* test is a useful tool for discerning legislative intent, the outcome of the test "is not controlling when [contrary] legislative intent is clear from the face of the statute or the legislative history."[22]

Under the *Blockburger* test, attempted first-degree murder and second-degree weapons misconduct constitute separate offenses. Each statute requires proof of an element that the other statute does not. Attempted first-degree murder requires proof of the defendant's specific intent to kill, whereas the theory of second-degree weapons misconduct set out in AS 11.61.195(a)(3)(B) requires that the defendant shoot at a

---

[18]  *Whitton v. State*, 479 P.2d 302, 312 (Alaska 1970).

[19]  *Linden v. Anchorage*, 501 P.3d 238, 244 (Alaska App. 2021); *Whalen v. United States*, 445 U.S. 684, 688-89 (1980).

[20]  *Blockburger v. United States*, 284 U.S. 299 (1932).

[21]  *Id.* at 304; *Todd v. State*, 917 P.2d 674, 678 (Alaska 1996) (explaining that under federal law, "[i]f the statutes pass muster under the *Blockburger* test, cumulative punishment is presumptively allowable.")

[22]  *Garrett v. United States*, 471 U.S. 773, 779 (1985); *Albernaz v. United States*, 450 U.S. 333, 340 (1981); *Linden*, 501 P.3d at 244.

dwelling.[23] The legislative history of second-degree weapons misconduct reinforces the differences between these statutes. While attempted first-degree murder focuses on the defendant's intent to harm an individual, second-degree weapons misconduct under AS 11.61.195(a)(3)(B) focuses on the generalized risk to public safety from shooting at a dwelling, untethered from whether the defendant intended individualized harm.

Because attempted first-degree murder and second-degree weapons misconduct are presumptively separate offenses under the *Blockburger* test and the legislative history does not rebut this presumption, we conclude that the federal double jeopardy clause does not require merger here.

*Why we reject Evangelista's sentencing claims*

Evangelista raises two sentencing claims. First, Evangelista contends that the superior court's sentencing comments were inadequate to support the sentence imposed. Second, Evangelista contends that his composite sentence is excessive.

The superior court merged Evangelista's assault and attempted murder convictions for shooting at Diaz and sentenced him on the remaining nine counts (two counts of attempted first-degree murder, two counts of second-degree weapons misconduct, and five counts of third-degree assault). At trial, the jury found four aggravating factors. At sentencing, the superior court noted the jury's findings of the aggravators, analyzed each of the *Chaney* criteria, and sentenced Evangelista to a composite term of 47 years with 10 years suspended (37 years to serve).[24]

---

[23] *Compare* AS 11.41.100(a)(1)(A) & AS 11.31.100(a) *with* AS 11.61.195(a)(3)(B).

[24] Evangelista's composite sentence is broken down as follows: for each count of attempted first-degree murder, 15 years to serve with 10 additional years suspended (active time consecutive to the other); for each count of second-degree weapons misconduct, 1 year to serve (consecutive to each other and the attempted first-degree murder sentences); and for each count of third-degree assault, 2 years to serve (consecutive to the other sentences, and partially consecutive to each other (1 year consecutive, 1 year concurrent)).

Evangelista first argues that the superior court's sentencing comments were inadequate because they were "merely rhetorical and did not support the imposition of any particular sentence." Alaska Statute 12.55.005 requires that sentencing courts consider seven factors in sentencing, commonly known as the *Chaney* criteria.[25] The sentencing record should indicate that the court considered each factor, and we urge courts to thoroughly explain why they have chosen a particular sentence. However, a remand is only warranted if the court's sentencing comments "afford no insight into its reasons for imposing a particular sentence or when they affirmatively indicate that the sentence was not properly based on the relevant *Chaney* factors."[26]

We have independently reviewed the court's sentencing remarks and find that they offer sufficient insight into why the court imposed Evangelista's sentence and were not "merely rhetorical." The court examined the facts of the case in detail, particularly while discussing the potential merger of counts and the proposed aggravating and mitigating factors. The court then examined the sentencing law applicable to attempted first-degree murder, compared Evangelista's case to other attempted first-degree murder cases, and analyzed each of the *Chaney* factors.

Evangelista also argues that his composite sentence is excessive.[27] We review a criminal sentence under the "clearly mistaken" standard, a deferential standard that recognizes that a "permissible range of reasonable sentences" could be imposed in any given case.[28] Evangelista faced a sentencing range of 5 to 99 years for attempted

---

[25] *See State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970).

[26] *Arnold v. State*, 751 P.2d 494, 506 (Alaska App. 1988) (citing *Smith v. State*, 691 P.2d 293, 295 (Alaska App. 1984)).

[27] When reviewing a composite sentence, we do "not require that a specific sentence imposed for a particular count or offense be individually justifiable as if that one crime were considered in isolation." *Felber v. State*, 243 P.3d 1007, 1013 (Alaska App. 2010).

[28] *McClain v. State*, 519 P.2d 811, 813-14 (Alaska 1974).

first-degree murder (two counts).[29] As a first felony offender, Evangelista was subject to a presumptive sentencing range of 0 to 2 years for second-degree weapons misconduct (two counts) and 0 to 2 years for third-degree assault (five counts).[30] The superior court sentenced Evangelista to a composite sentence of 47 years with 10 suspended (37 years to serve).

We have independently reviewed the sentencing record and conclude that Evangelista's sentence is not clearly mistaken. The superior court found that Evangelista created a "serious risk" when he fired eight gunshots into an occupied trailer. The superior court found that Evangelista was no doubt aware that Diaz and her children were inside the trailer and that he was aware of the substantial police presence when he fired the second round of shots. The superior court noted Evangelista's lack of remorse, as evidenced by Evangelista's prison phone calls to his sister where he blamed his neighbors for the criminal charges.[31] The superior court also noted that Evangelista's conduct had seriously impacted the sense of safety of his neighbors.[32]

Given the seriousness of Evangelista's conduct, the court's concerns about his lack of remorse, and the court's careful evaluation and balancing of the *Chaney* factors, we conclude that Evangelista's composite sentence is not clearly mistaken.[33]

---

[29] AS 12.55.125(b).

[30] Former AS 12.55.125 (d)(1), (e)(1) (pre-July 2019).

[31] The presentence report noted that a police officer had listened to calls between Evangelista and his sister, in which he "stated that the charges against him were unfair and were made by his 'snitch neighbors,' his neighbors were 'fucking with him,' he believed he was arrested 'unjustly,' and blamed his neighbors for accusing and harassing him."

[32] The presentence report noted that Diaz told police that Evangelista was known for routinely shooting his gun into the air in an apparent effort to frighten his neighbors.

[33] *Felber v. State*, 243 P.3d 1007, 1013 (Alaska App. 2010); *Morrissette v. State*, 524 P.3d 803, 807 (Alaska App. 2023) (citing *McClain*, 519 P.2d at 813-14).

*Conclusion*

For the reasons stated in this decision, the judgment of the superior court is AFFIRMED.